IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANGELA FORD, et al.                     :

                                        :

        v.                              :   Civil Action No. DKC 11-3039

                                        :

UNITED STATES OF AMERICA, et al.        :
                                        :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this medical malpractice case are five motions: (1) a motion for summary judgment filed by Defendants Calvert Memorial Hospital of Calvert County, Emergency Medicine Associates, P.A., and Matthew Christianson, M.D. ("Defendants") (ECF No. 69); (2) a motion for partial summary judgment filed by Defendant United States of America ("Government") (ECF No. 70); (3) a motion to seal exhibits filed by the Government (ECF No. 72); (4) a motion *in limine* under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), to strike and preclude any expert testimony regarding cerebral angiopathy filed by Plaintiff Angela Ford (ECF No. 80); (5) a motion for admission of facts or, in the alternative, to compel unqualified responses to Plaintiff's requests for admissions filed by Plaintiff Angela Ford (ECF No. 92); and (6) a motion to set a trial date filed by Plaintiff Angela Ford (ECF No. 103).  The issues have been fully briefed, and the court now

rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendants' motion for summary judgment will be denied. The Government's motions for partial summary judgment and to seal will be granted. Plaintiff's motions to strike and preclude and for admission of facts will be denied. The motion to set a trial date will be denied as moot.

## I.   Factual Background[1]

On February 3, 2009, Plaintiff Angela Ford began prenatal care at Malcolm Grow Obstetrics and Gynecological Clinic ("Malcolm Grow"). Malcolm Grow is a United States Air Force clinic located at Andrews Air Force Base. On August 31, 2009, Plaintiff began to display elevated blood pressure consistent with preeclampsia and, three days later, laboratory studies showed elevated protein consistent with preeclampsia. On September 22, 2009, Plaintiff gave birth to her child. Five days later, on September 27, 2009, at approximately 8:10 pm, Plaintiff went to the emergency room of Defendant Calvert Memorial Hospital ("CMH"). Plaintiff presented with a blood pressure of 191/104 as well as severe headache, nausea, "tingly" feeling, and light head. She was evaluated by Defendant Dr. Christianson and her blood pressure dropped to 151/95.

---

[1] Unless otherwise noted, the facts outlined here are construed in the light most favorable to Plaintiff, the nonmoving party as to both motions for summary judgment.

Plaintiff underwent a CT scan of her head that was interpreted to be normal with no evidence of acute infarction, acute or chronic hemorrhage, or mass effect. Her blood and urine were tested and the urine test revealed no evidence of protein. At 11:30 pm, Plaintiff was discharged by Dr. Christianson without having administered anti-hypertensive medication and she was instructed to follow up with her OB/GYN doctor in the next day or two.

The next day, Plaintiff went to her OB/GYN at Malcolm Grow with a blood pressure of 181/93 and a headache. Plaintiff was seen by Dr. Cortney Harper, an employee of the United States. She was prescribed Labetalol, an anti-hypertensive medication, and instructed to take 100 mg orally twice a day. She was discharged later that day. At 8:10 pm, Plaintiff went to Malcolm Grow's emergency room with a blood pressure of 171/91. Just after midnight on September 29, 2009, Plaintiff was witnessed having a seizure in the emergency room. Ultimately, Plaintiff was found to have suffered a contemporary cortically based hemorrhage in the right middle frontal lobe sulcus caused by eclampsia. She has since been diagnosed with postpartum eclampsia and epilepsy. The cerebral hemorrhage did not occur between the time Ms. Ford was at CMH on September 27 and when she went to Malcolm Grow and saw Dr. Harper at 10:00 am on

September 28. Plaintiffs[2] allege that Defendants provided inadequate care and treatment to Ms. Ford.

The Maryland Health Care Malpractice Claims Act (the "Malpractice Claims Act"), Md. Code Ann., Cts. & Jud. Proc. §§ 3-2A-01 *et seq.*, governs procedures for medical malpractice claims in the state of Maryland. *See, e.g., Carroll v. Konits*, 400 Md. 167, 172 (2007). On September 10, 2011, Plaintiffs filed a Statement of Claim in the Healthcare Alternative Dispute Resolution Office ("HCADRO"). The HCADRO is an administrative body established by the Malpractice Claims Act.

On October 24, 2011, the United States removed the case to this court as the claim against the United States is for negligence performed by one of its employees. 28 U.S.C. § 2679.[3] (ECF No. 1). Plaintiffs filed an amended complaint on March 26, 2012 (ECF No. 42), alleging medical negligence, specifically that Defendants owed Plaintiff Angela Ford a duty to exercise that degree of skill and care ordinarily possessed and used by health care providers acting in the same or similar circumstances. Plaintiffs allege that Defendants breached this

---

[2] Mr. Nathan Ford, Ms. Ford's then-husband, is also a Plaintiff.

[3] Plaintiffs represented that, pursuant to the Federal Tort Claims Act ("FTCA"), they filed Standard Form 95, more than six months had passed and the claim was never denied, therefore claim was exhausted administratively and the court has subject-matter jurisdiction. 28 U.S.C. § 2675(a).

duty in multiple ways, including failing to: (1) recognize that Ms. Ford was suffering from the effects of preeclampsia and was at risk for developing eclampsia in the post-partum period; (2) recognize that Ms. Ford was suffering from the effects of eclampsia and/or preeclampsia in post-partum period; (3) monitor and treat Ms. Ford for eclampsia and/or preeclampsia; (4) ensure that Ms. Ford's blood pressure was stabilized prior to releasing her from Malcolm Grow and CMH; (5) monitor and treat Ms. Ford's elevated blood pressure; and (6) take steps to prevent Ms. Ford from suffering a hemorrhagic stroke in the post-partum period. Plaintiffs allege that these breaches of duty directly and proximately caused Ms. Ford to suffer a hemorrhagic stroke, which caused permanent and severe injuries.   Ms. Ford also alleges that the United States, including its employees Dr. Cortney Harper and Dr. Marc Hester, breached their duty of care by failing to recognize preeclampsia in the pre-natal setting and being otherwise negligent.   Plaintiffs' second claim is for damage to the marital relationship suffered by Mr. Ford, including loss of companionship, affection, assistance, and impairment of sexual relations.

On September 5, 2013, Defendants filed a motion for summary judgment.   (ECF No. 69).   That same day, the Government also filed a partial motion for summary judgment for all allegations except those relating to Dr. Harper and a motion to seal some of

the exhibits to its summary judgment motion.  (ECF Nos. 70 and 71).  On September 23, 2013, Plaintiffs opposed both motions (ECF Nos. 77 and 78), and the Government and Defendants replied on October 1 and October 10, 2013, respectively (ECF Nos. 79 and 83).  The motion to seal is unopposed.  On October 8, 2013, Ms. Ford filed a motion *in limine* to strike and preclude any testimony that Ms. Ford suffered from "cerebral angiopathy." (ECF No. 80).  The Government opposed the motion on November 8, 2013 (ECF No. 90), and Ms. Ford replied on November 25, 2013 (ECF No. 91).  Finally, on November 26, 2013, Ms. Ford filed a motion to compel admission of facts or, in the alternative, unqualified responses to her requests for admissions.  (ECF No. 92).  Defendants and the Government separately opposed the motion on December 13, 2013 and January 3, 2014, respectively. (ECF Nos. 96 and 99).  Ms. Ford replied on December 30, 2013 and January 21, 2014.  (ECF Nos. 97 and 100).

## II. Motions for Summary Judgment

### A.    Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A properly supported motion for summary judgment

requires the nonmoving party to show that a genuine dispute exists. If the nonmoving party fails to make a sufficient showing on an essential element of that party's case as to which that party would have the burden of proof, summary judgment is appropriate. *Celotex*, 477 U.S. at 322–23.

A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v.*

*Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (*quoting Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)

### B.   Analysis: Defendants' Motion

Plaintiffs' claims are for medical malpractice, "which includes the elements of duty, breach, causation, and harm." *Barnes v. Greater Balt. Med. Ctr., Inc.*, 210 Md.App. 457, 480 (2013). Defendants contend that judgment should be granted to them because Plaintiffs have failed to set forth expert testimony to establish causation: *i.e.*, that the alleged breach of the applicable standard of care by Defendants caused Ms. Ford's injuries and alleged damages. To prove causation, Plaintiffs have to:

> establish that but for the negligence of the [Defendants], the injury would not have occurred. *Jacobs v. Flynn*, 131 Md.App. 342, 354 (2000). Because of the complex nature of medical malpractice cases, expert testimony is normally required to establish breach of the standard of care and causation. *Id*.
>
> The expert testimony must show causation to a "reasonable degree of probability." *Id*. at 355. Reasonable probability exists when there is more evidence in favor of the causation than against it. *Id*.

*Barnes*, 210 Md.App. at 481.   Defendants contend that Plaintiffs offered only one witness on the standard of care issue – Dr. Lisa Morikado – and Plaintiffs' separate causation witness did not testify as to Dr. Morikado's standard of care, but to his own standard of care.   Dr. Morikado testified that Dr. Christenson breached the standard of care when he discharged Ms. Ford from CMH when her blood pressure was consistently above 140/90 and she complained of a headache and feeling "tingly." According to Dr. Morikado, those are symptoms of preeclampsia, and Dr. Christenson was wrong either not to admit her to the hospital or, alternatively, to discharge Ms. Ford without giving her medication to bring her blood pressure below 140/90.

Much of the focus of the depositions concerned Dr. Morikado's second option: failing to bring down Ms. Ford's blood pressure before discharging her.   Dr. Morikado testified that "our standard of care guidelines through almost all of our textbooks . . . is that you don't send someone home with a blood pressure of 140 over 90 unless they're completely asymptomatic." (ECF No. 69-10, at 25, Trans. 92:18-22).   Dr. Morikado testified that Hydralazine and Labetalol were two medications that treat high blood pressure in this situation.   When asked how much of either medication would have been required for Ms. Ford, Dr. Morikado stated that she did not know because people have different responses to them.   Dr. Morikado was asked how quickly

the medications would have brought down the blood pressure to
140/90, and she stated that "both of those medications . . .
have rapid onset.  So it could have been five minutes. . . .  Of
course, I would probably watch her for a half hour, an hour, and
make sure they stayed down."   (ECF No. 69-10, at 20, Trans.
69:24 - 70:6).   Later, Defense counsel honed in on Dr.
Morikado's standard of care opinion:

> Q: So can you tell me, just so I understand
> your standard of care opinion, assuming that
> he put her on medication, brought her blood
> pressure down to 140 over 90, he could
> discharge her on oral labetalol and follow
> up with her OB[/GYN] within 24 hours --
>
> A: Correct.
>
> Q: -- yes?
>
> A: Correct.  Assuming he talked with the OB
> --
>
> Q: Labetalol --
>
> A: If he talked with the OB and finds out
> that they can see her tomorrow morning,
> recheck her pressure, and with the - the
> caveat that if her head - if her headache
> goes up, she needs to go back in, all those
> caveats, yes, I think she - he could have
> done that.
>
> . . .
>
> Q: If it is clear to the physician, Dr.
> Christianson . . . that the patient's blood
> pressure has now been brought down to 140
> over 90, the standard of care would allow
> him to discharge this patient on oral
> labetalol or some other form of
> antihypertensive, with the understanding

> that she was going to be seen in close
> follow-up by her obstetrician --
>
> A: Correct.
>
> Q: -- correct?
>
> A: And if not by her obstetrician . . .
> coming back to the ER.
>
> Q: Okay.
>
> A: And she followed up the next day.

(ECF No. 69-10, at 22, Trans. 77:15 - 78:3, 78:19 - 79:9).   The
I.V. drip employed in the emergency department would last for
three to four hours.   Dr. Morikado would have started Ms. Ford
on 100 milligrams of Labetalol, twice a day, but said there was
no hard and fast rule on that amount.   (ECF No. 69-10, at 22,
Trans. 80:2-9).   Dr. Morikado agreed that the follow-up element
of the standard of care was satisfied when Ms. Ford visited her
OB/GYN at 10:00 am the next day.   (ECF No. 69-10, at 22, Trans.
79:18 - 80:1).   Dr. Morikado did not believe that even if Dr.
Christenson followed her standard of care, it would have changed
the outcome.   (*See* ECF No. 69-10, at 26, Trans. 93:17-22 ("Q:
[E]ven if Dr. Christianson had taken the action that you
indicated the standard of care would have required, you cannot
say to a reasonable degree of medical probability whether the
outcome would have been different.   Correct?   A: Correct.
Yes."))

Defendants next point to the testimony of what they allege is Plaintiffs' one expert on causation as it relates to Defendants' alleged failures: Dr. Aaron Caughey.  According to Defendants, when presented with Dr. Morikado's standard of care, Dr. Caughey testified that that standard of care would not have changed the outcome for Ms. Ford.

> Q: Let me ask you to assume that the following occurred: In the emergency room on September 27, this patient was administered an I.V. medication either Hydralazine or Labetalol and her pressure was reduced to 140 over 90 or less.  The I.V. medication was stopped.  The patient was placed on Labetalol at a dose of 100.  Told to take one pill after she got home and ultimately told to follow up with her obstetrician for a blood pressure check within 12 to 24 hours.  If - if all of those things had been done, can you say that her outcome would have been any different just with that set of actions?
>
> A: The - the one - the one - so - so if the - if the I.V. medication was given over, say, a three or four hour period and then everything else was as you state, then no, I think the outcome would have been exactly the same.
>
> . . .
>
> So I'm assuming that, you know, what you're doing is you're changing what happened to lower her blood pressures to a mild range while she's in the ED using I.V. medication which would have been a great thing to have done.  But then for some reason you're stopping it and sending her out which is - would have been a foolish thing to have done which nobody would have done.  And so it's - which is why it's confusing.  I mean, you

12

> wouldn't start an I.V. drip on someone and
> then send them out the door. . . . [B]ut I
> took your assumptions and in your
> assumptions then you're sending her out the
> door with basically a medication that's
> inadequate to treat her hypertension so she
> could have gone on to the exact same
> outcome.

(ECF No. 69-11, at 37, Trans. 138:20 - 140:10).   Even sending

Ms. Ford out of the hospital with 100 mg of Lebetalol would not

have changed things because that would have been too low a dose

to control her blood pressure, which "[w]e know it was too low

because she was placed on that regimen and it didn't - it wasn't

efficacious." (*Id.* at 37, Trans. 142:16-18).

> A: I mean, this is kind of like a dam
> breaking, right?  And so it is true that the
> chronicity over the prior two, three days
> does matter to some degree, right?  So you
> don't just - a river doesn't - I mean, this
> is not akin to a dam sitting there, a river
> just rushing down and knocking the dam over,
> right, kind of out of the blue.  This is
> more the river is high.  It's eroding the
> dam little by little.  So did those three
> hours of high blood pressures contribute
> overall?  Yes.  But again, she had high
> blood pressures probably before she came to
> the emergency room.  She had them for the
> next 24 hours so I would say just lowering
> it for those three hours is not going to
> significantly affect the outcome.
>
> . . .
>
> Q: So even if transiently the blood pressure
> were brought down to the safe range as you
> described it on the 27th and the morning
> hours of the 28th before the patient got to
> Dr. Harper, that would not have made a
> difference in the outcome.  Is that fair?

> A: I believe that's asked and answered, yeah?
>
> Q: Yeah. I mean, I just used the term "transiently" because that's what I think we've been talking about. Would you agree with that statement?
>
> A: Yes.

(ECF No. 69-11, at 38-39, Trans. 144:19 - 145:6). According to Defendants, because Dr. Caughey was unable to state to a reasonable degree of probability that if Dr. Christenson had followed the standard of care as outlined by Dr. Morikado then Ms. Ford's injuries would have been avoided, Plaintiffs have not demonstrated a genuine dispute on the causation element of their medical malpractice claim.

Plaintiffs respond by contending that Defendants are mischaracterizing Dr. Morikado's testimony. According to Plaintiffs, Dr. Morikado testified that if Ms. Ford had hypothetically had her blood pressure clearly *stabilized* and her headache had resolved, then she could be discharged from the emergency room to follow up with her doctor. Plaintiffs point to the following exchange between Defense counsel and Dr. Morikado:

> Q: Okay. So let's do it this way: If it is *clear* to the physician, Dr. Christianson --
>
> A: Uh-huh.
>
> Q: -- that the patient's blood pressure has

> now been brought down to 140 over 90, the
> standard of care would allow him to
> discharge this patient on oral labetalol or
> some other form of antihypertensive, with
> the understanding that she was going to be
> seen in close follow-up by her obstetrician
> --
>
> A: Correct.

(ECF No. 69-10, at 20, Trans. 78:19 - 79:3 (emphasis added)).

According to Plaintiffs, "[t]he premise of defense counsel's hypothetical was that Ms. Ford had her hypertension 'clearly' resolve[d]." (ECF No. 77-1, at 6). Dr. Caughey testified that under that hypothetical, failure to act according to the standard of care caused Ms. Ford's injuries:

> Q: But just assume that she's given - that
> the patient is given the I.V. drip in the
> emergency room on the 27th. She is
> monitored. Her blood pressures are
> stabilized. Then she's given an oral
> medication. Then she's monitored for a
> period of time and she's stabilized on the
> oral medication so that her blood pressure
> is actually stabilized. Assuming that, do
> you have an opinion as to whether her
> outcome would have changed?
>
> A: Oh, yes. That would reduce the
> probability that she'd have a bad outcome
> significantly.

(ECF No. 69-11, at 41, Trans. 155:23 - 156:13).

Plaintiffs next argue that Dr. Caughey testified that Defendants' mischaracterization of Dr. Morikado's standard of care would not have been possible:

15

Reason number one is that under his hypothetical I'm allowing an actual real amount of time it takes to do these things. I'm not making it happen magically. So I wasn't asked to assume magic. So I'm assuming reality which it takes time to do these things. It would take, you know, six hours of these I.V. medications and it would take another six hours of assessment of the oral antihypertensive medications. So she wouldn't have been discharged from the ED [emergency department] until 10 or 11 a.m. Right? I mean, at the very earliest. So she's not going to go to Dr. Harper's office from there, she's going to go home on this oral antihypertensive medication at the proper dose, right.

Let's say that she - the doctor somehow, almost magically, gave her the oral hypertensive first. Right. Didn't start with an I.V. Gave her the oral one first. Gave her 400 milligrams p.o. [per mouth]. Watched her for six hours and the - her blood pressures came down to the mild-moderate range. Then she would have shown up - and then went and saw Dr. Harper the next day. She would have seen Dr. Harper on the appropriate medication. Would have been maintained on such and the outcome would have been changed.

(ECF No. 69-11, at 43, Trans. 162:25 - 163:24). Because it is not possible to *clearly stabilize* one's blood pressure in three to four hours, then according to Dr. Morikado's standard of care testimony, a doctor in Dr. Christenson's position should never have sent home Ms. Ford.

Plaintiffs have demonstrated a genuine dispute of material fact on causation. Dr. Caughey testified that the principal reason why he did not find that Defense counsel's hypothetical

16

would have made a difference in the ultimate result for Ms. Ford is not so much that she was discharged immediately after her blood pressure fell below 140/90, without further observation to ensure that her blood pressure had stabilized below that number. Instead, he took issue with the fact that Defense counsel's hypothetical had her released on 100 mg of Labetalol taken twice a day. This dosage would not have been sufficient to keep her blood pressure below 140/90. As a result, Ms. Ford's blood pressure would be in a safe zone for only three to four hours (the time she was in the hospital) which, given the length of time she was hypertensive both before and after her visit to CMH, would not have made a difference in the ultimate result. Defense counsel presented this standard of care as Dr. Morikado's, but that is not exactly what she testified. She did not explicitly state that 100 mg twice a day was the dosage that should have been given to Plaintiff, but instead stated that the dosage is what she would usually start out with, but that there is no hard and fast rule. (ECF No. 69-10, at 22, Trans. 80:2-9). Later, defense counsel walked Dr. Morikado through his understanding of her standard of care opinion. After providing Ms. Ford with an I.V. of Labetalol, which dissipates after three to four hours, Dr. Christianson should have provided "the 100 milligrams *or whatever the dosage of the Labetalol oral medication would be given*. Correct?" Dr. Morikado concurred in

17

this summary.  (ECF No. 69-10, at 23, Trans. 81:3-6 (emphasis added)).  Taking all evidence in the light most favorable to Plaintiffs, Dr. Morikado allowed for the fact that a 100 mg dosage is just a rough guide and it could be more or less depending on the patient.  Dr. Caughey testified that if Ms. Ford was discharged with a sufficient dosage of Labelatol – after bringing down her blood pressure at the hospital – the outcome would have been different.[4]  This is sufficient to

---

[4] Plaintiffs also argued that Dr. Jerome Block offered testimony sufficient to create a genuine dispute of material fact.  In his deposition, however, Dr. Block appeared to testify as to the medical cause of Ms. Ford's injuries, not that the deviation from the standard of care caused the medical afflictions that injured Ms. Ford.  (See ECF No. 77-5, at 3, Trans. 27:22 – 28:2 ("I think her brain was being struck by hypertensive problems which led to her hemorrhage, cerebral edema, subsequent seizure disorder with some transient numbness of the left side of her face, which eventually resolved.")).  In their opposition to Defendants' motion, Plaintiffs attach an affidavit of Dr. Block wherein he states that had Ms. Ford's blood pressure been brought down and maintained below 140/90 at the hospital, and then discharged with oral antihypertensives with instructions to follow up with her OB/GYN in the next 24 hours, she would not have suffered her brain injuries.  (ECF No. 77-6 ¶ 3).

Defendants argue that this affidavit should not be considered because it comes six weeks after the close of discovery.  Plaintiffs' Rule 26(a)(2) disclosures, however, list Dr. Block as someone who may testify on causation and if asked to, he will testify that if the standard of care had been followed, Ms. Ford would not have suffered her injuries.  (ECF No. 77-2, at 4).  At his deposition, Dr. Block also testified that "[i]f asked is this [Ms. Ford's injuries] any residua [sic] consequent to the treatment received, I would clearly render an opinion in that regard."  (ECF No. 77-5, at 3, Trans. 26:2-4).  Dr. Block's affidavit can be considered and it provides further

demonstrate a genuine dispute of material fact and summary judgment for the Defendants is inappropriate.[5]

### C. Analysis: The Government's Motion[6]

In their complaint, Plaintiffs allege that the Government breached its duty of care, causing Ms. Ford to suffer injuries. (ECF No. 37 ¶¶ 25-30). They further elaborate that "USA, its agent, servants, employees, and deemed federal employees, including Cortney Harper, M.D. and Marc Hester, M.D." either did not possess the required degree of skill or did not use the degree of skill demanded of them in treating Ms. Ford. The Government argues that Plaintiffs have identified Dr. Harper as the only government agent or employee who has committed medical negligence. Thus, at the conclusion of discovery, Plaintiffs have asserted a *prima facie* case against only Dr. Harper and,

---

support for the conclusion that a genuine dispute of material fact exists as to causation.

[5] On January 12, 2015, Plaintiff filed a motion to set a trial date, in which she essentially argues that summary judgment is inappropriate and that the case should proceed to trial. (ECF No. 103). As explained above, Defendants' motion for summary judgment will be denied. Following the issuance of this memorandum opinion, the court will hold a telephone scheduling conference with the parties on a date set forth in the accompanying order. Thus, Plaintiff's motion to set a trial date will be denied as moot.

[6] Plaintiffs' suit against the Government is under the FTCA. Under the FTCA, the governing law is the "law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Because the alleged medical malpractice occurred in Maryland, its law governs.

therefore, have no basis to proceed with any medical malpractice claim against any other agent or employee of the Government.

In their opposition, Plaintiffs admit that no expert testimony has been offered against any Government employee with regard to causation and damages except Dr. Harper. They note that Dr. Caughey has been disclosed as a causation expert for the Plaintiffs and may testify that Dr. Hester – a Government employee – negligently failed to follow up on an elevated protein urinalysis done on September 2, 2009. If the door is opened on cross-examination by either counsel, then Dr. Caughey may bring forth his opinion that Dr. Hester was negligent in his treatment of Ms. Ford. (ECF No. 78).

In essence, Plaintiffs do not dispute the Government's position. Plaintiffs have not presented any evidence establishing a *prima facie* case as to any Government agent except for Dr. Harper. Consequently, Plaintiffs' case against the Government for medical malpractice will be limited to the actions or omissions of Dr. Harper.[7]

---

[7] The Government also moved to seal Exhibits 1-4 of its motion. (ECF No. 71). These exhibits contain Ms. Ford's medical records. The motion will be granted. While there is a First Amendment right of access to documents filed in connection with a summary judgment motion in a civil case, *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 578 (4th Cir. 2004), medical records may be sealed, especially here, where the class of exhibits is narrow, they were not relevant to the disposition of the motion, and the records have been produced in redacted form as part of the Defendants' motion.

**III. Motion to Preclude[8]**

**A.   Standard of Review**

Plaintiff has filed a motion *in limine* to preclude anyone from testifying that Ms. Ford had "cerebral angiopathy."  Under Federal Rule of Evidence 702, the district court has "a special obligation . . . to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (*quoting Daubert*, 509 U.S. at 589).  Rule 702 provides:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The United States Court of Appeals for the Fourth Circuit explained Rule 702 as follows:

> The first prong of this inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable – that is, whether it is supported by adequate validation to render it trustworthy.  *See* [*Daubert*, 509 U.S.] at 590 n.9.  The second

---

[8] The motions to preclude and for admissions are brought by Plaintiff Angela Ford alone.  Accordingly, references will be made to "Plaintiff" in the singular.

prong of the inquiry requires an analysis of whether the opinion is relevant to the facts at issue. *See id.* at 591-92.

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999).

To be considered reliable, an expert opinion "must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (*citing Daubert*, 509 U.S. at 592-93). The district court enjoys "broad latitude" in determining the reliability and admissibility of expert testimony, and its determination receives considerable deference. *Kumho Tire Co.*, 526 U.S. at 142 (*citing Gen. Elec. Co v. Joiner*, 522 U.S. 136, 143 (1997)). The proponent of the testimony must establish its admissibility by a preponderance of proof. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (*citing Daubert*, 509 U.S. at 592 n.10).

**B. Analysis**

Dr. Sibai has been offered as an expert for the Government who will testify - among other things - that Ms. Ford's injuries were the result of cerebral angiopathy, not preeclampsia or eclampsia. Plaintiff argues that Dr. Sibai's opinion does not (1) rest on sufficient facts or data, and (2) that his diagnosis is not made by applying reliable principles and methods to the

facts.   As to the first argument, Plaintiff points to Dr. Sibai's deposition where he testifies that the diagnosis for cerebral angiopathy is made by observing a bead-like appearance in the cerebral vessels.   Dr. Sibai testified that the test to detect the bead-like appearance was not done and, therefore, his opinion that Ms. Ford suffered from cerebral angiopathy fails to meet the basic requirement that it be based on sufficient facts and data.   (*See* ECF No. 80-1, at 2-3, Trans. 117:24 – 118:3 ("Q: So is there somewhere in this record where there's a reference to the presence of bead-like appearance that enabled you to make the diagnosis?  A: No.   I made my opinion.   It's based on my experience with all the clinical findings."")).   As the Government correctly points out, however, this is a selective reading of Dr. Sibai's deposition.   Elsewhere in his deposition and also in his report, Dr. Sibai explained the symptoms of cerebral angiopathy and the fact that Ms. Ford exhibited these symptoms, including a headache between three and fourteen days post-partum; hypertension; taking of anti-inflammatories such as Motrin and anti-depressants such as Zoloft; and the absence of clinical findings indicative of preeclampsia.   (ECF Nos. 90-1, 90-3).  Ms. Ford was not given the test for cerebral angiography that would determine definitively whether she had cerebral angiopathy, but the fact that it cannot be determined definitively is not the same as saying that it was not the case

to a reasonable degree of medical probability. Cerebral angiopathy is not an ongoing condition; a test performed on Ms. Ford now would be of no help. Plaintiff's demand that an expert have the results of such a test would effectively prevent any testimony concerning a condition where an allegedly negligent doctor failed to administer the required test at the crucial moment.

Plaintiff also argues that Dr. Lee Monsein, another Government expert, testified that cerebral angiopathy is a diagnosis reserved for individuals who have the bead-like appearance and do not have hypertension. Dr. Monsein testified, however, that Ms. Ford does have a history of severe hypertension. (ECF No. 80-3, at 3, Trans. 104:4-8). Plaintiff contends that because Ms. Ford did not have the test needed to diagnosis cerebral angiopathy and she had hypertension, there is nothing in the record to support Dr. Sibai's opinion. The medical literature provided by both parties indicates that 20-40% of patients with cerebral angiopathy do not have hypertension, however. (ECF Nos. 80-2, at 3; 90-4, at 5). Dr. Monsein also testified that he would have included cerebral angiopathy on his differential diagnosis of Ms. Ford. (ECF No. 90-6, at 17, Trans. 57:11-13). Finally, in her reply, Plaintiff points to Dr. Sibai's deposition where he states that he could not say, within a reasonable degree of medical probability, that

Motrin and Zoloft caused or contributed to Ms. Ford's cerebral angiopathy. (ECF No. 90-5, at 27, Trans. 102:17 – 104:17). Dr. Sibai is clear that these medications did not cause cerebral angiopathy, but are associated with the condition. Although an expert opinion as to cerebral angiopathy made solely on the presence or absence of these drugs may not be sufficiently reliable under *Daubert*, in combination with the other indicators above, the Government has demonstrated sufficiently that the expert's opinion is admissible, irrespective of the weight it should be afforded. Plaintiff's motion will be denied.

## IV. Motion for Admission of Facts/Compel Unqualified Responses

The last motion to consider is Plaintiff's motion to compel reasonable, unqualified responses to her requests for admissions pursuant to Rule 36(a)(6). Both Defendants and the Government submitted their initial responses to Plaintiff's requests. After Plaintiff found many of the responses unacceptably vague or nonresponsive, Defendants and the Government submitted supplemental responses to some of the requests. Plaintiff still finds unacceptable Defendants' responses to thirteen requests and the Government's response to fifteen requests.

"The purpose of Rule 36 admissions is to narrow the array of issues before the court, and thus expedite both the discovery process and the resolution of the litigation." *Lynn v. Monarch Recovery Mgmt., Inc.*, 285 F.R.D. 350, 363 (D.Md. 2012)

(citations and quotations omitted).  If a matter raised in a request for admission is not admitted, the responding party's answer "must specifically deny [the matter] or state in detail why the answering party cannot truthfully admit or deny it."  Fed.R.Civ.P. 36(a)(4).  The denial "must fairly respond to the substance of the matter."  *Id.*  When "good faith requires that a party qualify an answer or deny only a part of a matter, the answer [to the request for admission] must specify the part admitted and qualify or deny the rest."  *Id.*  The party responding to a request for admission also may "assert lack of knowledge or information as a reason for failing to admit or deny."  *Id.*  But the party may do so "only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny."  *Id.*  The two possible sanctions for a violation of Rule 36 are to order the matter admitted or to order the responding party to serve an amended answer.  "If a party's answers are evasive or fail to respond to the substance of the question, and the evidence establishes that the request should have been admitted, the court may deem the matter admitted."  *Lynn*, 285 F.R.D. at 363 (*citing S. Ry. Co. v. Crosby*, 201 F.2d 878, 880-81 (4th Cir. 1953)); *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 499 (D.Md. 2000) ("Failure to adhere to

the plain language of this statute requires that the fact in question be admitted.")

**A.   Requests 1-4 and 22-25**

**1.   Defendants' Responses**

Plaintiff's requests 1-4 and 22-25 concern Ms. Ford's medical history, asking Defendants to admit that, prior to the pregnancy, Ms. Ford did not have a history of: high blood pressure (1), preeclampsia (2), cerebral angiopathy (3), treatment by a psychiatrist (4), diagnosed hypertension (25), and did not have a medical history of: somatization (22), epilepsy disorder (23), or chronic headaches (24). As to the requests concerning high blood pressure, cerebral angiopathy, diagnosed hypertension, somatization, epilepsy disorder, and chronic headaches, Defendants responded:

> RESPONSE: Although no such history is known to this Defendant based on the medical records received to date on Mrs. Ford, this Defendant lacks sufficient information to either admit or deny the information set forth in this request and thereby denies the same.

> SUPPLEMENTAL RESPONSE: After reasonable inquiry, the information known or readily obtainable by this Defendant is insufficient to enable this Defendant to admit or deny.

> This Defendant does not have access to Ms. Ford's entire medical history; therefore, this Defendant cannot truthfully admit or deny.

On the preeclampsia question, Defendants responded: "Admitted that based on the information reviewed to date Angela Ford did not have a history of preeclampsia." Regarding the psychiatrist treatment question, Defendants responded: "This Defendant lacks sufficient information to either admit or deny the information set forth in this request insofar as this Defendant has not been provided with mental health records dating back to adolescence for Angela Ford and therefore denies the same."

Plaintiff contends that Defendants are improperly basing their nonresponsive answers on the existential claim that they do not have access to Ms. Ford's entire medical history and, therefore, some record demonstrating chronic headaches, for example, exists. Plaintiff submits that she has been responsive to Defendants' demands, providing medical releases for records as far back as when Ms. Ford was sixteen (16) years old. Plaintiff argues that, in any event, Defendants are required to respond to requests for admissions in good faith. Because there is no suggestion in all of the medical records, or any of the other information gathered in discovery, that Ms. Ford has a history of any of these afflictions, Defendants should be forced to admit these requests as true and accurate.

Defendants respond that they were not provided sufficient information to determine the asserted accuracy of the facts put forth by Plaintiff. Regarding the preeclampsia question,

Plaintiff provided them only one authorization for release of medical records from only one health care provider: Kettering Hospital in Ohio.  Those medical records pertain only to Ms. Ford's two previous pregnancies in 2000 and 2005 and did not include the pre-natal period for the 2000 pregnancy.  For that reason, Defendants qualified their answer to the preeclampsia request in good faith, stating that it was admitted based on information reviewed to date.  Regarding the other answers, Defendants state that they requested the names and address of each health care provider that Ms. Ford saw in the ten years preceeding the occurrence at issue in this case.  But Ms. Ford only provided the names and some addresses of health care providers she saw from the date of the occurrence (September 27, 2009) until September 2011.  Defendants tried to obtain the same information during Ms. Ford's deposition.  Ms. Ford testified that she was treated for depression during high school by the family doctor but could not remember the doctor's name.  Similarly, she could not remember the name of the obstetrician who treated her first two pregnancies.  After a back and forth with Plaintiffs' counsel, Plaintiff's counsel suggested asking Ms. Ford's mother, who was scheduled to be deposed shortly and who Ms. Ford indicated would know the identity of the doctor who treated her for depression.  When Ms. Ford's mother was deposed, however, she also could not remember the name of that doctor.

Defendants contend that they made reasonable efforts to obtain the identities of Ms. Ford's family doctor and the obstetrician who followed her during her first two pregnancies, but she has failed to provide them with this information. Consequently, Defendants should not be forced to make an admission when not provided the information necessary to determine the accuracy of the propounded facts.

Plaintiff replies that Defendants are acting in bad faith. She states that never before this opposition did they raise the issue of absent releases of medical records, nor did they ever file a motion to compel. Furthermore, in a portion of the deposition not provided by Defendants, Ms. Ford's mother identifies their family doctor by name: Kevin Harlan. The records from Kettering Hospital identified Dr. Art Altman as the attending obstetrician for both of Ms. Ford's pregnancies and also list a primary care physician: Dr. Michelle Russell. Plaintiff believes that Defendants knew this information months before the close of discovery and chose either to ignore it or not follow up with it by deposing these individuals or by requesting a release of their records on Ms. Ford. Plaintiff thus contends that there is no good faith basis for an objection or denial.

Plaintiff's arguments will be rejected. Defendants' qualified answers are reasonable given the evidence they requested and were provided.

### 2.   The Government's Responses

Plaintiff also takes issue with the Government's responses to Requests 1-4 and 22-25. The Government took a different tack, essentially admitting that there is no evidence that Ms. Ford had any of the various afflictions inquired about, but was not prepared to admit that she never, at any time, had the afflictions. For example, in response to Plaintiff's request that Ms. Ford did not have a history of high blood pressure, the Government responded:

> Response: Object as vague and ambiguous. Notwithstanding the objection, denied.
>
> Supplemental Response: The United States admits that no readily available medical records or other evidence demonstrate that Angela Ford had a history of high blood pressure prior to the pregnancy at issue, with the exception of a blood pressure reading of 148/79 on 8/19/07 at Calvert Memorial Hospital, but otherwise lacks sufficient knowledge or information to admit or deny the request.

(ECF Nos 92-5 and 92-6). Plaintiff makes the same arguments as she did in challenging Defendants' answers. The Government argues its qualifications were appropriate because considering how the questions were phrased, a straight "admit" would imply that Ms. Ford never had a history of high blood pressure, as

31

opposed to never having a medical record documenting a history of high blood pressure.  This is an appropriate qualification and Plaintiff's demand will be denied.

**B.   Request 19**

Plaintiff takes issue with Defendants' response to her request that "[n]o treating healthcare provider has ever documented suspected cerebral angiopathy as a cause of Ms. Ford's condition."  As with the first set of interrogatories discussed above, Defendants state that because they do not have access to Ms. Ford's entire medical history, they cannot truthfully admit or deny this request.  Plaintiff states that Defendants have every medical record from every healthcare provider Ms. Ford has seen since her injury and Defendants can point to no provider who has diagnosed or even suggested cerebral angiopathy as a diagnosis.  Defendants make the same arguments they made in regard to requests 1-4 and 22-25.  For the reasons stated above, the qualification is reasonable and Plaintiff's demand will be denied.

**C.   Requests 6-8**

Plaintiff objects to the Government's responses to requests 6, 7, and 8.  These requests concern Ms. Ford's blood pressure readings at various times during her stay at CMH.  Plaintiff asked the Government to admit that her blood pressure was a certain value at a certain time or that the records reflect that

her blood pressure never fell below a certain amount. The Government qualified its answers, admitting that the medical records indicate that the blood pressure was at the amount stated, but was unwilling to admit the inferences Plaintiff's requests imply. For example, the Government will admit that it will not challenge the medical record that states that Ms. Ford's blood pressure was 191/104 during triage at CMH. Similarly, the Government is prepared to admit that there is no record that Ms. Ford's systolic blood pressure ever dropped below 151, but is not prepared to admit – as Plaintiff's request implies – that her systolic blood pressure never dropped below 151 because Ms. Ford was not constantly monitored. The Government states that it has no intent to introduce evidence that contradicts CMH's medical records. The Government's responses are reasonable, especially in light of the fact that it represents it will not challenge the medical records, making it apparent that forcing the Government to take an unqualified position will not streamline the trial.

### D. Request 10

Plaintiff asked Defendants to admit that "[a] CT scan is not diagnostic for preeclampsia." Defendants objected to this request "insofar as 'diagnostic' is not defined relative to this Request. Without waiving this objection, admitted insofar as the diagnosis of preeclampsia is multifactorial." Plaintiff

contends that this is impermissible hair-splitting.  Defendants contend that their qualification was made in good faith given that Plaintiff did not define "diagnostic."  Defendants' argument is accepted.

### E.   Request 12

Plaintiff requested that Defendants and the Government each admit that at "September 28, 2009 at 10:29 am, Ms. Ford's blood pressure was evaluated at greater than 140/90."  Defendants and the Government each responded and Plaintiff takes issue with both.  Defendants draw a distinction between "evaluation" and "recording."  They object that the medical record does not state when the blood pressure was evaluated, only that it was recorded in the log at 10:29 am.  The Government admits the accuracy of the record, but takes issue with Plaintiff's use of the term "evaluated," contending that the term is undefined and not used by any of the medical professionals with regard to the taking or recording of blood pressure.  The Government contends that "evaluate" implies that the blood pressure remained at the level indicated in the request for the entire visit.  That cannot be admitted given the imprecision of the medical record and the centrality of that issue to this case.  Both Defendants and the Government's qualified answers are permissible and Plaintiff's demand will be denied.

**F.    Request 13**

Plaintiff requests that the Government admit that "[b]etween February 1, 2009 and October 1, 2009, the only antepartum or postpartum twenty-four urine collection study indicated protein elevated greater than 300 mg."  The Government admitted that Malcolm Grow's records reflected only one borderline positive protein indication but denies that this was the only test for proteinuria conducted during the stated period.  Plaintiff requests that this court order the Government to take out its qualifications.  The Government responds that these issues will certainly be part of a trial and points to experts who testified that the test results were consistent with statistical error or of questionable significance.  It argues that a careful and accurate response that incorporates the evidence relevant to this matter is not hairsplitting but necessary to frame the issue properly.  The Government's qualification is acceptable.

**G.    Request 15**

Plaintiff takes issue with Defendants' response to her request that Ms. Ford was discharged from Malcolm Grow without any documented improvement in her blood pressure.  Defendants denied this statement based on the documentation of an isolated, elevated blood pressure reading from Ms. Ford's records at Malcolm Grow.  Plaintiff argues that there was a single blood

pressure reading.   Either it was an improvement or not and
Defendants can point to nothing in the document or outside the
document that disputes the request.   Defendants contend that Dr.
Harper documented a "blood pressure isolated elevated" as part
of her assessment of Ms. Ford.   Given that the medical record
showed only an *isolated* elevated blood pressure, Defendants
could not, in good faith, admit that Ms. Ford was discharged
from Malcolm Grow without any documented improvement in her
blood pressure because an *isolated* elevated blood pressure, in
and of itself, may indicate an improvement in the patient's
blood pressure.   Defendants' qualification is permissible and
this dispute is more appropriately saved for trial.

      **H.   Request 17**

      The parties' final point of contention concerns responses
to Plaintiff's statement that "[p]reeclampsia can manifest for
the first time in the postpartum period."   Defendants stated,
"[a]dmitted but generally within the first two days following
delivery," while the Government stated, "[a]dmitted, usually
within the first 48 hours after delivery."   Plaintiff argues
that these statements are non-responsive and unnecessary to
admit or deny.   Defendants and the Government argue that their
qualification was made in good faith to restrict an unfairly
overbroad interpretation of Plaintiff's request.   This

36

qualification is reasonable and will be accepted.   Plaintiff's request will be denied.

## V.   Conclusion

For the foregoing reasons, the motion for summary judgment filed by Defendants will be denied.   The motion for partial summary judgment filed by the Government will be granted, as will their motion to seal.   The motion to preclude filed by Plaintiff will be denied, as will her motion for admission of facts.   The motion to set a trial date will be denied as moot. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
