FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
Southern Division

2016 MAR -4 P 2: 07

CLERK'S OFFICE
AT GREENBELT

BY_____DEPUTY

**ANGELA FORD,** *et al.,*                                        *

  **Plaintiffs,**                                         *

                      *

**v.**                                                             *   **Case No.: GJH-11-3039**

                      *

**UNITED STATES,** *et al.,*                                      *

  **Defendants.**                                         *

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

On September 29, 2009, one week after the uncomplicated delivery of her third child,

Plaintiff Angela Ford[1] developed a hemorrhage and suffered a grand mal seizure. There is little,

if any, dispute as to that fact. The existence and interpretation of nearly every other fact in the

narrative that forms this litigation has been the subject of vigorous debate by the parties and their

experts and leaves a number of questions for the Court to answer. Was the treatment provided to

Ms. Ford preceding the hemorrhage and seizure on September 28, 2009 appropriate? If not, was

any such improper treatment a cause of the hemorrhage and seizure? How significant are the

injuries Ms. Ford suffered? Have the injuries healed or will they linger into the future? Are the

injuries debilitating or manageable? Are the events of September 28, 2009 a cause of any such

ongoing injuries or are they the result of preexisting medical issues, or, perhaps, an independent

undiagnosed medical event occurring simultaneously? Many of these questions are,

unfortunately, unanswerable in any definitive sense. The Court will nonetheless sift through the

---

[1] While this case was pending, Ms. Ford remarried and changed her name to Angela Hysmith. For ease of reference, the Court will refer to her here as Ms. Ford.

testimony and exhibits and, pursuant to Federal Rule of Civil Procedure 52(a)(1),[2] make its

findings of fact and conclusions of law as to what are more likely than not the answers to these

exceedingly close questions.

## I. PROCEDURAL BACKGROUND

Ms. Ford and her then-husband, Nathan Ford (collectively, "Plaintiffs"), initiated this

action in September 2011 in the Health Care Alternative Dispute Resolution Office in Baltimore,

Maryland, against the United States of America (the "Government") under the Federal Tort

Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, as well as against Calvert Memorial

Hospital of Calvert County ("Calvert Hospital"), Emergency Medicine Associates, P.A., and

Matthew Christianson, M.D. (collectively, the "Private Defendants"), seeking to recover for

injuries that Ms. Ford sustained which, she claims, were the result of undiagnosed preeclampsia

and eclampsia. *See generally* ECF No. 2. Following removal of the action to this Court, ECF No.

1, Plaintiffs filed an Amended Complaint on March 26, 2012, in which they alleged in Count I

that the Private Defendants and the Government breached the standard of care in their treatment

of Ms. Ford on September 27 and September 28, 2009, respectively, by failing to diagnose and

treat Ms. Ford for preeclampsia and eclampsia after the delivery of her third child, and by failing

to treat her elevated blood pressure.[3] ECF No. 42 at ¶ 27. The Amended Complaint further

---

[2] Rule 52(a)(1) provides, in relevant part, that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court." To comply with this rule, the court "need only make brief, definite, pertinent findings and conclusions upon the contested matters, as there is no need for over-elaboration of detail or particularization of facts." *Wooten v. Lightburn*, 579 F.Supp.2d 769, 772 (W.D. Va.2008) (citing Notes of Advisory Committee on 1946 Amendments); *see also Sherwin-Williams Co. v. Coach Works Auto Collision Repair Center Inc.*, Civ. Action No. WMN–07–2918, 2012 WL 2343235, at *5 (D. Md. June 19, 2012) ("Rule 52(a) 'does not require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient.'" (quoting *Darter v. Greenville Comm. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962))).

[3] The Complaint also alleged that care rendered prior to September 27 and 28, 2009 by Marc Hester, M.D., an obstetrician employed at the government facility Malcolm Grow Medical Center, breached the standard of care. *See* ECF No. 42 at ¶ 31. Before trial, however, the Court, *Chasanow, J.*, granted the Government's Motion for Partial

alleges that the failure to render appropriate care was the proximate cause of a hemorrhagic stroke that caused Ms. Ford to suffer from permanent and severe injuries. *Id.* at ¶ 30. In Count II of the Amended Complaint, Plaintiffs' brought a claim for loss of consortium. After extended pretrial proceedings, the Court presided over a joint jury / bench trial from November 30, 2015 through December 18, 2015.[4]

At the conclusion of trial, the jury returned a unanimous verdict finding that there was no breach of the standard of care by the Private Defendants for the care rendered by Dr. Christianson on September 27, 2009. *See* ECF No. 224. In accordance with that verdict, the Court will now, by separate Order, enter judgment in favor of the Private Defendants.

On January 8, 2016, Plaintiffs and the Government submitted proposed findings of fact and conclusions of law, which the Court has reviewed and considered in arriving at its findings and conclusions.[5] *See* ECF Nos. 233, 234 & 235.

## II. FINDINGS OF FACT

### A. Personal Background of Angela Ford and Nathan Ford

Although many details of the Fords' lives will be dispersed and expanded upon in various sections of this Memorandum Opinion, it is useful to begin with a brief discussion of the

---

Summary Judgment and limited Plaintiffs' claims against the Government to the actions and omissions of Cortney Harper, M.D., the Government doctor who rendered care to Ms. Ford on September 28, 2009. *See* ECF Nos. 70, 104 & 105.

[4] Plaintiffs and Private Defendants jointly demanded a jury trial, ECF No. 29, but, pursuant to the FTCA, the action against the Government was required to be tried by the Court without a jury. 28 U.S.C. § 2402.

[5] On January 14, 2016, counsel for Ms. Ford filed a Motion to Strike the proposed findings of fact and conclusions of law filed by the Government, which reads as an opposition to the Government's filing. ECF No. 237. The Court finds nothing objectionable in the Government's proposed findings of fact and conclusions of law; the Government's submission, ECF No. 235, merely summarizes the facts which the Government asks the Court to find with respect to the evidence adduced at trial and includes argument by counsel as to the meaning of those facts. The Court has adopted some portions of the Government's proposed findings and rejected others, just as it has done with the Plaintiffs' submissions. The Court will therefore deny the Motion to Strike, and it further notes that it did not consider any substantive arguments made by Plaintiff's counsel in the Motion because to do so would be to allow Ms. Ford an opportunity to respond to the Government's submission, which the Court did not allow from any other party.

Plaintiffs' personal background to provide some context to the discussion that follows. Ms. Ford was born on January 28, 1982 and was raised in a suburb outside of Dayton, Ohio. While growing up, she participated in Girl Scouts and the 4-H program and played basketball. When she was in high school, her parents were briefly separated, but they eventually reconciled. During that time, Ms. Ford helped care for an uncle who had been diagnosed with brain cancer until his death. As a result of these stressful circumstances, Ms. Ford began treatment for depression and anxiety.

Ms. Ford attended high school into tenth grade, but that year she became pregnant with her first child and dropped out of school. In November 2000, Ms. Ford gave birth to her son, "AF."[6] After her son was born, Ms. Ford worked as a waitress and greeter at a restaurant and, one year later, obtained a high school equivalency certificate upon successful completion of General Educational Development ("GED") tests. Beginning in 2002, Ms. Ford attended a community college in Ohio, Sinclair Community College ("Sinclair"), but, after meeting Mr. Ford, she left the school after the spring 2004 semester without completing her degree. As for Mr. Ford, he, too, attended Sinclair, where he obtained certification to be an emergency medical technician ("EMT").

In October 2004, the Fords were married. Having become a father-figure to Ms. Ford's son, Mr. Ford legally adopted AF. The couple then had a second child, another son, "DF," in November 2005.

Mr. Ford had always wanted to serve his country and be a firefighter, and, in 2006, he joined the United States Air Force to fulfill that dream. The Fords had planned that, while Mr. Ford was in the Air Force and their children were young, Ms. Ford would be the primary

---

[6] In accordance with the policy underlying Federal Rule of Civil Procedure 5.2(a)(3) and to protect the privacy of the Fords' minor children, the Court will refer to the children only by their initials.

caregiver of the children. Once the children were all old enough to enter school full-time, Ms. Ford planned to return to school to become a licensed practical nurse ("LPN"). When Mr. Ford was stationed in Maryland, the family relocated there, and Ms. Ford worked as a cashier at a grocery store for a brief period of time. When Mr. Ford was deployed overseas, Ms. Ford left her job at the grocery store so that she could take care of the children.

After Mr. Ford returned from overseas in September 2008, Ms. Ford became pregnant with a third child. Her daughter, "SF," was born by caesarian section on September 22, 2009. As will be explained in greater detail below, several days after SF's delivery, Ms. Ford experienced a severe headache and had high blood pressure. On September 27, 2009, she sought treatment from the Emergency Department of Calvert Hospital where, after running various tests, she was released with instructions to follow-up the next day with her obstetrician. On September 28, 2009, she presented to the Obstetrics and Gynecology Clinic ("OB Clinic") at Malcolm Grow Medical Center ("Malcolm Grow")[7] with elevated blood pressure and a headache. She was prescribed a low dosage of blood pressure medicine and sent home with instructions to follow-up with a primary care physician within five days. On September 29, 2009, Ms. Ford returned to Malcolm Grow, this time to the Emergency Department, where a CAT scan[8] revealed that Ms. Ford had an intracerebral hemorrhage. After learning of the hemorrhage, and while still in the hospital, Ms. Ford suffered from a grand mal seizure.

Following this incident, Ms. Ford reported suffering from various ongoing injuries, including severe headaches and migraines, lethargy, and word-finding problems. Mr. Ford, who typically accompanied Ms. Ford to her medical appointments, reported to Ms. Ford's doctors that

---

[7] Malcolm Grow is a federal health care facility located at Andrews Air Force Base in Maryland where military service members and their dependents can receive a full range of medical treatment.

[8] A CAT scan, also called a CT scan, is a sophisticated x-ray examination that reconstructs images of a part of the body to be examined, here, the brain, and produces a series of images called axial images, or "slices," which are examined by doctors to help diagnose a patient.

he witnessed the left side of her face twitching and also witnessed "staring spells" where Ms. Ford would "space out" for short period of times and be unresponsive to touch or speech. After Mr. Ford showed a doctor a video of Ms. Ford's facial twitching, Ms. Ford was treated for epilepsy and instructed that she could not drive until she had been seizure-free for at least six months.

In an effort to better accommodate Ms. Ford's condition, Mr. Ford sought reassignment through the Air Force so that they could relocate to be closer to other family members who could help with childcare and otherwise serve as a support system. When that request was denied, Mr. Ford then sought to separate from the Air Force. When that request was granted, the family relocated to Williamsburg, Virginia in October 2010, where the only nearby family was Ms. Ford's aunt and a cousin she had never met. Around this time, Ms. Ford and Mr. Ford experienced marital difficulties and sought marital counseling. Unable to repair their relationship, the couple separated in 2012 and divorced in May 2013. After the separation and divorce, Ms. Ford continued to be the primary caregiver for the Fords' three children.

At some point in 2012, Ms. Ford met Dwayne Hysmith and she, along with her three children, moved into his home in December of that year. Ms. Ford and Mr. Hysmith began dating and were married in August 2015, and, as of the time of trial, they continued to live together in Virginia with Ms. Ford's children.

### B. Education and Employment

When Ms. Ford was first old enough to begin working, around age sixteen, she began working at a Chick-fil-A. After AF was born, she worked as a greeter and waitress at a restaurant, and, as previously indicated, obtained her GED, passing the GED test without any prior studying.

6

Ms. Ford became interested in pursuing a career in nursing after she helped care for her uncle during his battle with brain cancer. After obtaining her GED, she attended Sinclair for seven semesters where she initially received several passing grades in pass/fail courses, as well as As, Bs and Cs. Defense Joint Exhibit ("DJE") No. 38.[9] In her second semester, she completed a nurse aid training course, receiving a B, and she received an A the following semester in a pediatric care assistant course. She thereafter began working at a children's hospital as a nursing assistant. *See* DJE No. 43. Then, in her final semesters at Sinclair, at which time she was working at the hospital and had begun dating Mr. Ford, she received one D and eight failing grades before leaving school without completing her degree.[10]

After DF was born, Ms. Ford worked as a bookkeeper at Discount Drug Mart in Ohio, and, after the Fords moved to Maryland, she worked as a cashier at a grocery store. *See* DJE Nos. 35 & 36. Ms. Ford left her job at the grocery store in 2008 when Mr. Ford was deployed, and she has not had any stable employment since then. During at least some part of 2012, however, she occasionally staffed the cash register of a country store next to her house when a friend of hers, who owns the store, would leave to take breaks or run errands. Since April 2014 and continuing up until trial, she has also worked as a "distributor" with Young Living Essential Oils ("Essential Oils"), a company that sells oil products which Ms. Ford consumes to help with her headaches. *See* DJE No. 6. She became involved with Essential Oils when a friend of hers started selling the product and suggested that she try it. By signing up as a distributor, Ms. Ford can purchase the oils for herself at wholesale prices. The organization of the company is such that when one

---

[9] Where the Court is relying on or referencing a particular exhibit in the record, the citation to that exhibit will be referenced. For all other facts referenced in this Memorandum Opinion, the Court relies on its memory of the trial testimony, notes taken during trial, the Court's internal recording system, and available trial transcripts.

[10] Although it is of considerably less relevance, Ms. Ford's medical records also indicate that she was either held back or failed first grade and was enrolled in special education classes in first, second, and third grades. DJE No. 4 at 12.

person, a "sponsor," enlists another distributor, that new distributor is their "downline." When a downline makes a sale, the sponsor receives a percentage commission on that sale. Ms. Ford has signed up some downlines, mostly limited to her immediately family and close friends, but her sponsor has placed additional downlines underneath her in the sales organization, allowing Ms. Ford to receive some commissions for sales made by those individuals. Ms. Ford does not actively sell the product to others, but she promotes Essential Oils on social media websites, such as Pinterest. She spends an hour to an hour and a half per week on the computer to manage her Essential Oils business. In 2014, when she first started as an Essential Oils distributor, her highest monthly commission earning was approximately $114. In 2015, however, her income became more consistent and she earned an average of $556 per month, equating to an earning potential of approximately $6,600 annually.

### C. Depression and Anxiety

Beginning around the time of her parents' separation and the death of her uncle, Ms. Ford obtained antidepressants from a family physician, which she took intermittently for several years. She was taking antidepressants when she met Mr. Ford, though he did not observe that the depression and anxiety negatively impacted her life or their marriage.

In June 2007, Ms. Ford visited Malcolm Grow's Primary Care Clinic for treatment of anxiety and depression. The medical note for that visit indicates that Ms. Ford reported taking antidepressants off and on, including Lexapro, Wellbutrin, Prozac, Paxil, and Zoloft, and seeing a therapist about two years before. DJE No. 1 at 1. The note also indicates that Ms. Ford reported feeling tired or poorly, having decreased concentration ability, anxiety, depression with intermittent feelings of hopelessness, and low self-esteem. She reported that she had been doing

well with Lexapro but ran out of medication one week before. *Id.* The primary care physician

prescribed Celexa and indicated that Ms. Ford would consider therapy. *Id.* at 2–3.

Ms. Ford returned to the Malcolm Grow Primary Care Clinic in August 2007 for an

annual exam. She reported inadequate results with Celexa and was prescribed Lexapro. *Id.* at 8-

10. Ms. Ford obtained refills of the Lexapro prescription in November 2007 and March 2008,

though each time the prescribing doctor noted that Ms. Ford required follow up to review her

depression management. *Id.* at 12, 15–16. In April 2008, Ms. Ford obtained a Lexapro

prescription for 90 tablets and one refill from a doctor in the Primary Care Clinic who was

treating her for back pain. *Id.* at 17, 19–20. In December 2008, Ms. Ford was seen for depression

follow up and the note from that visit indicates that she reported that she had suffered from

depression since she was a teenager and that the symptoms were well controlled. The note

further indicates that Ms. Ford asked for and was prescribed Buspirone to treat anxiety. *Id.* at 25–

27. She did not, however, undergo any counseling or therapy for depression or anxiety during

this time.

In February 2009, early in her pregnancy with SF, Ms. Ford completed an Edinburgh

scale form, a screening tool designed to determine depression during pregnancy and in the

postpartum period. Tests which produce a score of thirteen or greater out of thirty total points are

considered a significant degree of depression, and Ms. Ford's responses produced a score of

fifteen. DJE No. 2 at 4, 27. That month, Ms. Ford began taking Zoloft for depression and

continued with Buspirone for anxiety. *Id.* at 23, 29. She was referred to Behavioral Health for

depression, *see id.* at 23, but she failed to follow up. During her pregnancy with SF, Ms. Ford's

depression remained stable while she was on a prescription for Zoloft, and, when the Edinburgh

scale test was administered again post-delivery, her score was twelve out of thirty. *Id.* at 84, 93, 99, 102, 106; DJE No. 4 at 29.

When Ms. Ford sought treatment from the Emergency Department at Calvert Hospital and from the OB Clinic at Malcolm Grow in September 2009, she reported a history of depression. DJE No. 3 at 2, 32. In October 2009, one month after her hemorrhage and seizure, Ms. Ford had her first visit with a neurologist, Rebecca Fasano, M.D., at Walter Reed Army Medical Center ("Walter Reed"), where she denied feeling more depressed than she felt before giving birth to SF. DJE No. 4 at 21.

Ms. Ford received only sporadic treatment for her depression and anxiety post-hemorrhage and seizure. On four occasions beginning in October 2009 and going through April 2010, she and Mr. Ford were seen in the Malcolm Grow Mental Health Clinic for marital therapy. *See* DJE No. 4 at 15–18, 117–18, 125–26, 130–31. She also received individual therapy at Malcolm Grow Primary Care Behavioral Health Clinic in January and February 2010. *Id.* at 60–61, 86–87. She received no further mental health treatment until August 2011, when she and Mr. Ford again went to marital therapy. *Id.* at 194–96. Ms. Ford has not been treated by any counselor, therapist, or psychiatrist for depression, anxiety, or any other mental health issues since August 2011, and she has not filled any prescriptions for anti-depressants since July 2014.

### D.  Overview of Relevant Medical Conditions

Because it will be relevant to much of the discussion that follows, it is helpful at this point to provide a brief overview of various medical conditions discussed during trial, and, in particular, medical conditions that are associated with pregnancy.

First, by way of background, hypertension, or high blood pressure, is generally a long-term condition that a person may suffer for years; it is not typically a condition that must be

treated on an emergency basis. That said, when an individual has a systolic blood pressure of 180 or greater, or a diastolic pressure of 110 or greater, *i.e.*, 180/110 mm Hg, that person is said to be in a stage of hypertensive urgency; a "normal" or baseline blood pressure is 120/80. If the blood pressure of 180/110 is also accompanied by evidence of end organ damage, for example, damage to the brain, heart, or kidneys, then the patient is in a stage of hypertensive emergency, which requires immediate treatment. Hypertension in pregnancy, in contrast, is defined as a sustained blood pressure of 140/90.

When a pregnant patient has gestational hypertension, the next concern is whether the patient has a syndrome called preeclampsia. Although medical definitions can vary, in general, when a pregnant patient has sustained elevated blood pressures, *i.e.*, multiple blood pressures exceeding 140/90, and elevated protein in their urine, a symptom known as "proteinuria," the patient is diagnosed with preeclampsia. Although this, too, is subject to some dispute, protein in urine is considered elevated if it exceeds 300 mg over a 24-hour period. A patient with preeclampsia may also have certain laboratory abnormalities showing the existence of HELLP syndrome, which stands for hemolysis, elevated liver enzymes, and low platelet count. Preeclampsia is considered severe if, among other symptoms, the patient's blood pressure exceeds 160/110, or the patient experiences cerebral or visual disturbances, pulmonary edema, or right upper quadrant pain, which may indicate that the liver is swelling. When severe hypertension or preeclampsia goes untreated, it can increase the risk of a brain hemorrhage or stroke. Because preeclampsia typically occurs during pregnancy, it is generally treated by delivering the baby. Preeclampsia can, however, occur during the postpartum period and, for obvious reasons, requires different treatment at that stage. When preeclampsia goes untreated, it can develop into eclampsia, which is essentially preeclampsia plus a seizure.

11

Although less common, another condition that can be associated with pregnancy is cerebral angiopathy, or Reversible Cerebral Vasoconstriction Syndrome ("RCVS"), which typically presents with a sudden onset headache—a "thunderclap headache." Cerebral angiopathy causes vasoconstriction, *i.e.*, the constriction of blood vessels, and can lead to brain edema, stroke, or a brain hemorrhage. Cerebral angiopathy is known to be associated with the use of vasoactive substances, which can have the effect of increasing the degree of vasoconstriction on blood vessels, especially in the brain. Typical vasoactive substances that are commonly used by pregnant and postpartum women include selective serotonin reuptake inhibitors (SSRI), such as Zoloft, and anti-inflammatory drugs for pain relief such as Motrin. Additionally, the body changes that a woman undergoes in the postpartum period may also have a vasoactive effect. After birth, the large volume of fluid that once occupied the placenta is reabsorbed or evacuated from the mother's body. This influx of volume causes changes in vascular tone and hormones that are commonly associated with vasoconstrictive diseases like cerebral angiopathy.

With this in mind, the Court will next turn specifically to the care Ms. Ford received preceding the development of the hemorrhage and seizure.

### E. Ms. Ford's Prenatal Care

From February 29, 2009 through September 14, 2009, Ms. Ford received prenatal care through the OB Clinic at Malcolm Grow. The doctor overseeing her prenatal care was Marc Hester, M.D. Ms. Ford's prenatal course was, overall, uncomplicated. DJE No. 2 at 27–30, 63–69, 82–84, 91–107, 118–20. Her baseline blood pressure during her pregnancy was 129/87, but toward the end of her pregnancy, on August 31, 2009, she had one mildly elevated blood pressure of 140/83. Plaintiffs' Exhibit ("PE") No. 1 at 1034. Out of precaution, Dr. Hester

ordered certain lab tests, which revealed that Ms. Ford also had slightly elevated protein in her urine, as indicated by a 24-hour urine protein test, at 303.6 mg/24 h. *Id.* at 1090. At a later visit, because her blood pressure had lowered to 137/86, *id.* at 1039, Dr. Hester did not treat Ms. Ford for preeclampsia.

Ms. Ford gave birth to SF on September 22, 2009 and experienced no complications during the scheduled caesarean section. She and her daughter were discharged on Thursday, September 24, 2009 in good health. DJE No. 2 at 124–233.

### F.  Care at Calvert Memorial Hospital on September 27, 2009

On September 27, 2009, five days post-delivery of her daughter, Ms. Ford began to experience a "terrible" headache. Because she had never suffered severe headaches or migraines before, Mr. Ford was concerned and decided to take her blood pressure while she sat in a recliner at home. By his measure, her blood pressure was 202/104. Mr. Ford repeated the test an additional four or five times before deciding to bring Ms. Ford to Calvert Hospital, the hospital closest to their home.

Ms. Ford arrived at Calvert around 8:05 p.m. and was admitted to the Emergency Department, where she reported that she had a headache that started at 5:00 p.m. and was a 7 on a pain scale of 1–10, with a 10 being the worst pain she had ever felt. She also reported that she was "feeling weird," and experiencing nausea. In triage, her blood pressure was measured as 191/104. In her medical history, it was reported that she had a cesarean section five days earlier and that she had a history of depression. PE No. 2 at 2000.

Dr. Matthew Christianson first saw Ms. Ford at 8:20 p.m. that evening, approximately fifteen minutes after she was admitted to the Emergency Department. Ms. Ford again reported that she had a headache and she explained that it had started on the right side but had moved to

13

the frontal portion of her head. She again indicated that the headache started around 5:00 p.m., and Dr. Christianson's visit note described the headache as being "sudden onset." *Id.* at 2002. She further stated that she was "tingly all over" and was feeling lightheaded. At that point, her blood pressure had decreased to 151/95 without having received any treatment.

Dr. Christianson examined Ms. Ford, and ordered that she receive intravenous fluids and Phenergan to treat her nausea and headache. Given her symptoms, his differential diagnosis included hypertensive emergency, HELLP syndrome/preeclampsia, and intracranial hemorrhage. Dr. Christianson ordered tests, including lab work and a CAT scan to rule out any medical emergency, all of which produced normal results. *See* PE 2 at 2015–21. He also ordered a "clean catch" urine sample to test for elevated protein in her urine using a urine dipstick test. A urine dipstick produces one of six results: negative, trace, 1+, 2+, 3+, or 4+. Ms. Ford's urine dipstick produced a negative result, indicating that there was no protein in her urine at that time. *Id.* at 2021. Dr. Christianson did not, however, seek to have Ms. Ford admitted to the hospital so that a 24-hour urine test could be completed, which, at least by some accounts, is a more accurate test for determining whether a patient has proteinuria.

While in the Emergency Department, Ms. Ford's blood pressure was measured four additional times at 9:40 p.m., 10:05 p.m., 10:30 p.m. and 11:30 p.m., and those measurements were 154/78, 162/85, 164/89, and 151/87, respectively. *Id.* at 2001. Ms. Ford was discharged from Calvert Hospital at 11:30 p.m. with a prescription for Compazine to aid with her nausea and headache and with instructions to follow up with her obstetrician in one to two days. *Id.* at 2003–04, 2007–08; *see also* DJE No. 3 at 3–28.

## G.  Care at Malcolm Grow Medical Center on September 28 and September 29, 2009

### 1. Background Facts

Around 10:00 a.m. on September 28, 2009, less than twelve hours after she was discharged from Calvert Hospital, Ms. Ford, accompanied by Mr. Ford, arrived at the Malcolm Grow OB Clinic, where her blood pressure was recorded as 181/93 and she complained of a headache on a pain scale of 5/10. DJE No. 3 at 32. While Ms. Ford was waiting to be seen by the on-call physician, the Fords spoke with Dr. Hester. Ms. Ford was visibly upset and expressed her frustration that her headache had not been treated.

Ms. Ford was treated by Cortney E. Harper, M.D., who had recently completed her residency in obstetrics and gynecology, and, at that time, was not yet board certified. Dr. Harper's visit note indicates that Ms. Ford reported that she had a headache that had started the previous day and that she experienced headaches with stress. Ms. Ford recounted her visit to the Emergency Department the previous night for elevated blood pressure and headache, which was relieved somewhat with Percocet and Motrin. Other relevant data noted in Dr. Harper's visit note included that Ms. Ford had stopped taking Buspirone for anxiety one week earlier and was taking Zoloft daily for depression, that she was "feeling very stressed at home with 3 kids," although her mother was there helping her, and that the headache "started after her newborn did not sleep all night." *Id.* Ms. Ford also denied having any vision changes or right upper quadrant pain. *Id.*

Ms. Ford told Dr. Harper that the head CT scan from the day before at Calvert Hospital was within normal limits, and Dr. Harper noted and recorded normal preeclampsia labs from the previous evening. Dr. Harper did not order another dipstick urine test or a 24-hour protein urine test. In the visit note under her assessment and plan, *i.e.*, her diagnosis, Dr. Harper entered "Blood Pressure Isolated Elevated." *Id.* Dr. Harper concluded that Ms. Ford's headache and

15

elevated blood pressure were likely secondary to stress. She restarted Buspirone for anxiety,

increased Zoloft to 100 mg, and prescribed Tylenol with codeine for her headache. While Dr.

Harper's notes indicate that she had initially planned to refer Ms. Ford to Internal Medicine the

next day for assessment for hypertension, she instead decided to treat her high blood pressure by

prescribing 100 mg of Labetalol twice a day, and then referred her to Internal Medicine for a

consult for hypertension. Dr. Harper directed Ms. Ford to return to the OB clinic for a blood

pressure check if she was unable to schedule an appointment with Internal Medicine within five

days. She also directed Ms. Ford to return as soon as possible if she had other symptoms of

preeclampsia. Ms. Ford was discharged from the OB Clinic around noon. *Id.* at 32–33. The

record is absent of any additional blood pressure measurements taken during that visit, although

Dr. Harper testified at trial that, under the custom and practice of the OB Clinic, additional blood

pressure measurements would have been taken. Dr. Harper could not recall, however, what Ms.

Ford's blood pressure was at the time she was discharged. Thus, the only blood pressure

measurement in the record for that day was the one initially recorded at181/93. *Id.* at 32, 34.

Ms. Ford's headache was not resolved by the evening of September 29, 2009 and she

began to experience numbness on the left side of her face. At approximately 8:10 p.m., 32 hours

after her discharge from the OB Clinic, Ms. Ford arrived at Malcolm Grow Emergency

Department complaining of headache and fever. DJE No. 3 at 29; *see also* PE No. 4 at 5007. Her

blood pressure was recorded as 171/91 on her right arm, and 164/101 on her left arm, and she

reported that she had taken three doses of Labetalol. She also indicated that her headache pain

scale was between 4 and 5 out of 10. DJE No. 3 at 29, 36. A head CT scan was ordered, which

showed a 1.1 x 0.6 cm hemorrhage in her right frontal lobe. *Id.* at 46.

Just after midnight, Ms. Ford saw a rainbow of lights and then went into a grand mal seizure, which lasted at least one minute. She was administered magnesium sulfate, a drug used to stop seizures. PE No. 4 at 5012–13. At approximately 2:00 a.m., she was transferred to the National Naval Medical Center at Bethesda ("Bethesda Naval"), where Ms. Ford remained for a little under two weeks for further care and treatment. DJE No. 3 at 37, 42.

### 2. Standard of Care

To support the claim that Dr. Harper breached the standard of care in her treatment of Ms. Ford on September 28, 2009, Plaintiffs introduced the testimony of Aaron Caughey, M.D., MPP, MPH, Ph.D, a doctor and professor of obstetrics and gynecology, who testified that it was "not within the standard of care to rely on a dipstick in the postpartum period if it is a negative reading for proteinuria in order to rule out preeclampsia." He indicated that if a dipstick test produces a result of 1+ or higher, there is an 85 percent chance that the person will have proteinuria, and a doctor must then follow-up with a 24-hour urine test. If the dipstick produces a negative result, however, the test is "almost useless" because 40 to 60 percent of women who have significant proteinuria under a 24-hour urine collection will produce a negative urine dipstick.

In support of his opinion, Dr. Caughey relied on certain medical literature that was, as of 2009, the most recent literature discussing these issues. According to the American Congress of Obstetricians and Gynecologists Bulletin ("ACOG Bulletin"), hypertension in pregnancy is defined as a blood pressure reading with a systolic pressure of 140 or above *or* a diastolic pressure of 90 or above. That publication noted that one-quarter of women with gestational hypertension will develop proteinuria, *i.e.*, preeclampsia. The criteria for a diagnosis of preeclampsia, according to the ACOG Bulletin, are a blood pressure as described above and

proteinuria of 300 mg or above as determined by a 24-hour urine sample. Finally, the ACOG Bulletin stated that preeclampsia is considered severe if one or more of certain factors are present, including a systolic blood pressure measurement of 160 or higher or a diastolic pressure of 110 or higher on two occasions at least six hours apart while the patient is on bed rest, right upper quadrant pain, impaired liver functions, pulmonary edema or cyanosis, or cerebral or visual disturbances.

Williams Obstetrics 22d Ed, another piece of medical literature referred to by several witnesses at trial, indicates that gestational hypertension is defined as a blood pressure of 140/90 in a pregnant woman. It notes that some women with gestational hypertension may develop other findings of preeclampsia, such as headaches or proteinuria. Preeclampsia, according to Williams Obstetrics, is diagnosed by a blood pressure of 140/90 and proteinuria of greater than 300 mg/24 hours *or* a dipstick with a result of 1+ or greater in random urine samples. According to Williams, "the degree of proteinuria may fluctuate wildly over any 24 hour period even in severe cases. Therefore a single random sample may fail to demonstrate even significant proteinuria."

Even putting aside the issue of proteinuria, Dr. Caughey also testified that it was a deviation from the standard of care to release Ms. Ford from the clinic without appropriately treating her high blood pressure. He stated:

> So honestly, whether she has severe gestational hypertension or severe preeclampsia, with those blood pressures, that's what we need to focus on. I honestly don't care whether we're going to call it—at this moment in time when I'm taking care of the patient, whether or not the protein is elevated or not. . . . [R]ight now it's the blood pressures we need to focus on. These are severely elevated blood pressures. We need to get them down to protect her organs, her kidneys, but most importantly, her brain.

Given that Ms. Ford's only recorded blood pressure on September 28, 2009 was 181/93, Dr. Caughey testified that he could not rule out that Ms. Ford had at least hypertension, even if not

preeclampsia, because Ms. Ford had two measurements of severely elevated blood pressure twelve hours apart—at least one at Calvert Hospital and one at Malcolm Grow. In order to satisfy the standard of care, according to Dr. Caughey, Dr. Harper was required to do one of three things: (1) admit Ms. Ford to the hospital so that her blood pressure could be monitored and controlled; (2) send her to the emergency department, assuming she could remain there for twelve to twenty-four hours for blood pressure control; or (3) keep her in the clinic at Malcolm Grow for at least two to four hours to monitor her blood pressure. In order to do so in the clinic setting, he testified that the staff would need to collect "serial blood pressures" by setting up a cuff to measure blood pressures at certain intervals. If, in the clinic setting, her blood pressure stabilized, she could be released and monitored in an outpatient setting.

The Government's expert, Harold Fox, M.D., testified that the diagnostic criteria for preeclampsia in 2009 was not uniform; rather, there was different criteria being used clinically by different physicians, and he pointed out that the ACOG Bulletin and the Williams Obstetrics textbook differ in certain respects. Dr. Fox indicated that, when it comes to determining the necessary blood pressure measurement to diagnose preeclampsia, it was his opinion that a patient would need to have both a systolic pressure of 140 or above *and* a diastolic pressure of 90 or above. He pointed to the Williams Obstetrics textbook to support this point. He also pointed to the Williams textbook to support his opinion that, within a reasonable degree of medical probability, it was within the standard of care for a clinician to rely on a negative urine dipstick test to rule out preeclampsia. He testified that, although the urine dipstick test is not 100 percent accurate, its accuracy is high enough to be reliable to rule out that diagnosis. Finally, Dr. Fox testified that, although failure to record any additional blood pressure measurements taken at the Malcolm Grow clinic might violate an *administrative* standard of care, assuming that Ms. Ford's

blood pressure was in fact measured again and those blood pressure measurements were reviewed by Dr. Harper, then it was Dr. Fox's opinion that the standard of care was satisfied in this case.

### H.  Ongoing Treatment and Injuries

#### 1. Brain Imagery

On September 30, 2009, at Bethesda Naval, a magnetic resonance imaging ("MRI") head scan was taken of Ms. Ford, producing three different types of imaging: FLAIR sequence images, diffusion weighted images ("DWI"), and apparent diffusion coefficient ("ADC") images; the DWI images and ADC images are simply different computer images of the same data. When a DWI image shows bright or white areas on a brain, it is indicative of edema, or swelling with fluid. And when a DWI image is converted into an ADC image, those white areas become dark areas, and, in order to determine whether a DWI image produces a positive result for edema, a radiologist must compare the light areas on the DWI image against the dark areas on the ADC image.

Ms. Ford's clinical history at the time of the MRI, as stated on the radiologic examination report, indicated that "[t]he patient is a 27-year-old female who is several days postpartum who suffers with eclampsia manifesting as severe hypertension and seizures. The patient had a hemorrhage in the right frontal lobe." PE No. 3 at 1059. The radiologic examination report further indicated that there was evidence of a "contemporary cortically based hemorrhage in the right middle frontal lobe sulcus" and "mildly restricted diffusion," but found that there were "no classic findings of hypertensive encephalopathy." *Id.* at 1060. It was undisputed by both Plaintiffs' and the Government's experts that the MRI also showed evidence of a syndrome known as "PRES," which stands for posterior, reversible encephalopathy syndrome. This title is

20

a misnomer, however, because the syndrome known as PRES is, in fact, not always something that occurs in the posterior region of the brain and is not always reversible.

Caren Jahre, M.D., a neuroradiologist, explained at trial that there was evidence of edema on the September 30, 2015 MRI, as seen on the FLAIR sequence images. There are two different types of edema: vasogenic edema, which is fluid which leaks from the vessels of the brain and is reversible, and cytotoxic edema, which is swelling of the cells of the brain, and is a term that is used when there is ischemia—lack of blood flow or oxygen to the brain—which leads to a stroke. Dr. Jahre testified that, on the DWI images, the MRI scan showed areas of brightness which were evidence of cytotoxic edema, the end result of which is "restricted diffusion," or infarction, *i.e.*, dead tissue, which causes irreversible brain injury. In other words, Dr. Jahre agreed with the finding by the Government radiologist who initially reviewed Ms. Ford's MRI at Bethesda Naval that the MRI showed mildly restricted diffusion. She disagreed, however, with that portion of the radiologist's report that indicated that there were "no classic findings of hypertensive encephalopathy," because hypertension can cause PRES. It was Dr. Jahre's opinion that PRES was the cause of the brain hemorrhage as well as the cause of the restricted diffusion seen on the MRI, and, from her review of Ms. Ford's medical records, she was aware of no other cause for the PRES other than preeclampsia and eclampsia. She further stated that, even if restricted diffusion is "mild," it cannot be dismissed as insignificant because even minor brain injury can be problematic. Similarly, Dr. Jahre explained that even after the clot from a hemorrhage disappears, damage to the underlying tissue will remain. On cross-examination, however, she testified that if there was, in fact, no restricted diffusion, Ms. Ford would not have had any long-term injury. Nevertheless, she also explained that determining how any tissue

damage would manifest itself as future injury must be left to a clinician; in other words, the long-standing effect of any brain injury was beyond Dr. Jahre's expertise.

Defense expert Lee Monsein, M.D., also a neuroradiologist, disagreed that the September 30, 2009 showed evidence of restricted diffusion or permanent brain injury. Rather, according to Dr. Monsein, the areas of brightness identified by Dr. Jahre on the DWI imagery were the result of a phenomenon called "T2 shine through" that results from capturing various imagery, creating an appearance of increased brightness that is not actually present in the brain. This is essentially a "false positive." Both Dr. Monsein and Dr. Jahre agreed that a neuroradiologist must compare the DWI image to the ADC image to determine whether the areas of brightness on the DWI image actually produces a positive result for brain injury. Dr. Monsein, however, testified that when comparing the areas of brightness on the DWI image from the September 30, 2009 MRI point by point with the ADC images, as one must, he found that the areas of brightness on the DWI images were also bright on the ADC images, indicating that the areas on the DWI images were not areas of restricted diffusion, but examples of "T2 shine through." It was his opinion, therefore, that the brightness on the DWI images showed a "false positive."

Additionally, Dr. Monsein testified that permanent cell death or brain damage is determined by examination of subsequent CT scans for areas of old or healed infarct, which would be filled with water, and show up as black spots on CT scans. On January 28, 2010, four months after her brain hemorrhage occurred, Ms. Ford had another CT head scan. PE No. 5 at 5229. The radiologist report for that exam indicates that there had been "interval resolution of the parenchymal hemorrhage in the right frontal lobe, without any new areas of hemorrhage." *Id.* In other words, the hemorrhage was no longer noticeable and at least any vasogenic edema that was

present on previous brain scans had resolved. Ms. Ford had another CT scan on February 7, 2014, and the report from that scan also indicates that there was no evidence of infarct. DJE No. 4 at 310. Thus, it was Dr. Monsein's opinion that Ms. Ford had no permanent brain damage because any reversible vasogenic edema found with PRES that does not have a restricted diffusion component would not result in permanent injury.

When Ms. Ford was discharged from Bethesda Naval on October 5, 2009, her discharge diagnosis was "pre-eclampsia/eclampsia superimposed on pre-existing hypertension, postpartum," hemorrhage, "cerebrovasuclar disorder in the puerperium, postpartum," "essential hypertension" and "convulsions." PE No. 50 at 11561.

### 2. Concerns of Family and Friends

After Ms. Ford returned home, the family began what Mr. Ford described as having to "start life all over again." Ms. Ford had difficulty cleaning the house and caring for the children. She would often sleep throughout the day or take prolonged naps, during which time Mr. Ford was unable to wake her. She also suffered from frequent headaches. Mr. Ford took leave from work to care for the family, and, whereas Ms. Ford had done most of the work caring for DF after his birth, the responsibility to care for, feed, and wake up at night with SF fell on Mr. Ford because Ms. Ford was incapable of doing so.

On October 26, 2009, less than one month after Ms. Ford's hemorrhage and seizure, she, along with Mr. Ford, went to a counselor for the first time. DJE No. 4 at 9–18. The notes of that visit indicate that Ms. Ford felt frustrated and guilty for not having been able to help care for SF "until just a few days ago," and also described that she was experiencing certain cognitive complaints, such as an inability to read and comprehend as easily as she had been able to before the incident. *Id.* at 15–16. Mr. Ford indicated that things at home were improving, however, and

the note provides: "Overall [the] couple appears to be adjusting very well to a very dramatic event." *Id.* at 15.

On November 2, 2009, at a gynecology visit, Ms. Ford provided the doctor with a neurology report that indicated that all symptoms had "essentially resolved" except for the occasional "facial twitch." PE No. 50 at 11092. Ms. Ford reported at that visit that she "desires to start having intercourse again." *Id.* On January 4, 2010, however, Mr. Ford sent an email to Ms. Ford's treating neurologist indicating that he continued to be concerned about Ms. Ford's condition because she was taking prolonged naps, during which time it was difficult to wake her, despite pinching, yelling, or smacking her. *Id.* at 11502. He noted that he had gone back to work and worried about leaving Ms. Ford home alone with the children. *Id.*

On February 4, 2010, Ms. Ford reported to her therapist that she was having "[c]oncern for husband having to take on caretaking role." DJE No. 4 at 86. On March 1, 2010, Ms. Ford's therapy record states: "her husband has been very supportive with her recent medical situation. However, [patient] has some feelings of guilt, frustration, and anger because she cannot fulfill the role of mother and wife as she would like to[]. . . . [Patient] feels that she and her husband had a strong foundation in their marriage but that these new stressors have definitely affected their happiness." PE No. 10 at 15036.

On April 13, 2010, another therapy record indicates that the Fords' intimacy was affected by these "new stressors"; Ms. Ford reported that her libido had "decreased," with a "lack of drive," and she was advised to, "build on strengths in marriage to regain the intimacy missing from the recent stressors." *Id.* at 15043. Two weeks later, on April 27, 2010, during a psychiatric appointment, Ms. Ford stated, "she and her husband have been fighting more and she is more irritable and frustrated with her family." *Id.* at 15054. Although the couple went to marital

therapy, Ms. Ford eventually sought a divorce because she resented that Mr. Ford had acted more as her caretaker than her husband, and she desired more independence. Ms. Ford and Mr. Ford separated in 2012 and divorced on May 10, 2013.

Although Ms. Ford reported having difficulty maintaining intimacy with Mr. Ford, not long after their separation, she began her courtship with Mr. Hysmith. The two were married in August 2015, and, by all accounts, continue to have a stable and healthy relationship. For instance, during a period of illness, Mr. Hysmith proudly stated that Ms. Ford acted as his caretaker and never left his side. Mr. Hysmith testified at trial that Ms. Ford continues to have a very good relationship with her children, that she cleans the house and does the laundry, and that she has her own car and drives herself and the children as necessary. To the extent that Ms. Ford had any difficulty providing the necessary affection, assistance, and conjugal fellowship to maintain a stable relationship immediately after her injury, any such difficulty has clearly improved.

Others close to the Fords offered differing accounts of Ms. Ford's standard of living post-injury. On the one hand, Ms. Ford's mother, Nancy Combs, testified that her daughter is a different person now than she was prior to her injury. Ms. Combs explained that Ms. Ford used to be a very social and personable woman, but now her anxiety makes it difficult to socialize the way she once did. Ms. Combs believed that as of May 2013, Ms. Ford appeared to be "coming back" to the way she was prior to the injury, but that she still has not fully recovered. Similarly, Steven Ford, Mr. Ford's father, thought that Ms. Ford's personality had changed after her hemorrhage and seizure. He also testified that he did not believe that Ms. Ford suffered from depression or anxiety until after SF's birth.

25

On the other hand, Ms. Ford's distant cousin, April Seitz-Brown, who had not met Ms. Ford until 2011 after the Fords moved to Virginia, indicated that, in all their time together, Ms. Ford never complained about having difficulty cleaning the house or caring for the children. According to Ms. Seitz-Brown, Ms. Ford had her own car and would drive herself and her children places and, any time Ms. Seitz-Brown visited the Fords' home, the house was "immaculate." Ms. Seitz-Brown further testified that Ms. Ford relayed to her that the reasons Ms. Ford could not go back to school for nursing was due to tight finances, but also that "if anybody found out that she was going to school or working, it could mess up her lawsuit."

### 3. Facial Twitching, Staring Spells, and Headaches

After the incident, Ms. Ford began to suffer from "twitching spells" and "staring spells." During a twitching spell, her left facial muscles would rhythmically twitch, mostly above her lip but also including her left eyelid. During a staring spell, Ms. Ford would "zone out" and stare into space, and would be unresponsive to touch or voice. Mr. Ford recorded instances of both types of these spells on his cell phone. Although twitching spells occurred both during sleep and wakefulness, Ms. Ford was unaware that she was having them.

On October 27, 2009, Ms. Ford had her first visit with Dr. Fasano, her treating neurologist at Walter Reed. Dr. Fasano's note from that visit indicates that Ms. Ford had a history of "hypertensive intracerebral" right frontal hemorrhage one month prior, while she was one week postpartum. DJE No. 4 at 21. The note further states that Ms. Ford had "mildly decreased sensation on the [left] lower face" and that she was continuing to have headaches, although they were improving. Dr. Fasano indicated that the "[left] facial numbness is likely related to the hemorrhage" but that this, too, was improving. *Id.*

In one visit, Mr. Ford showed Dr. Fasano one of the cell phone videos of Ms. Ford's facial twitching, which Dr. Fasano noted was "suspicious" for seizures. Dr. Fasano instructed Ms. Ford that she could not drive until seizures could be ruled out. DJE No. 4 at 52. On December 9, 2009, Dr. Fasano prescribed Topamax to treat Ms. Ford's headaches, which is also prescribed to control seizures. On January 21, 2010, Ms. Ford reported to Dr. Fasano that her headaches were getting slightly less frequent. *Id.* at 62.

In an effort to determine whether Ms. Ford was in fact having seizures, Dr. Fasano ordered a routine electroencephalogram ("EEG"), which is a non-invasive procedure that detects electrical activity in the brain. There are different types of EEGs, including routine EEGs, sleep-deprived EEGs—which require minimal sleep by the patient the night before—and video-monitored EEGs, which require an in-patient stay of several days. In accordance with Dr. Fasano's order, a routine EEG was performed on Ms. Ford at Bethesda Naval on January 28, 2010, which produced normal results. DJE No. 4 at 50. After the normal EEG results, Dr. Fasano ordered a sleep-deprived EEG, which Ms. Ford did not undergo. Ms. Ford also declined Dr. Fasano's request to undergo an inpatient video EEG, indicating that she did not want to leave her children to be admitted to the hospital. *Id.* at 152.

During a visit on February 23, 2010, Ms. Ford told Dr. Fasano that she forgot to take her prescribed Topamax, and that she continued to have chronic daily headaches, which, according to Dr. Fasano's visit note, were likely due to stress. *Id.* at 105. In other visits, Ms. Ford attributed her headaches to her menstrual cycle, stress, weather, and sleep deprivation. *Id.* at 191, 228; DJE No. 5 at 44, 108.

On a visit on June 18, 2010, Dr. Fasano's visit note indicated that Ms. Ford reported some improvements; although she was still experiencing chronic headaches and migraines, she

believed that the facial twitching had improved. Mr. Ford, however, reported that he still noticed twitching episodes while Ms. Ford was asleep or when she was exerting herself too much. DJE No. 4 at 152.

After the Fords moved to Virginia, Susan Brown, M.D. became Ms. Ford's treating neurologist. At her first visit on January 27, 2011, Ms. Ford reported continued facial twitching during wakefulness and sleep, provoked by stress or fatigue, with rhythmic twitching lasting 1 to 5 minutes, occasionally accompanied by staring. DJE No. 4 at 176–79. Dr. Brown instructed Ms. Ford that she could not drive for at least six months after her last seizure. Despite being treated with increasing doses of seizure medication, Ms. Ford continued to have "breakthrough seizures" between visits with Dr. Brown through June 21, 2012. *Id.* at 191–93, 208, 223. Ms. Ford also continued to have headaches, but indicated that they were triggered by heat and menses. *See id.* at 191. In an August 2012 visit, Ms. Ford reported that she did not think she was having any twitching spells, but she was not sure because they were often nocturnal, and she and Mr. Ford were separated at that point. *Id.* at 228–31. Then, at a visit in October 2012, Ms. Ford reported that she had two twitching spells while she was with Mr. Ford, followed by a headache and lethargy for a few minutes afterwards. *Id.* at 233–35. In December 2012, Dr. Brown asked Ms. Ford to schedule a sleep-deprived EEG, but she did not. *See id.* at 236. Ms. Ford last saw Dr. Brown in August 2013 and again reported that she experienced left facial twitching, followed by a headache. *Id.* at 256. Although Dr. Brown made a working diagnosis of epilepsy for Ms. Ford and treated her with medication for seizures, headaches, and depression, on July 28, 2011, Dr. Brown noted that, given the amount of medication Ms. Ford was receiving, her "seizures should be well controlled fairly rapidly" but that "[g]iven the stress overlay, there may be a possibility

28

of psuedoseizures,"[11] *id.* at 192, a concern which Dr. Brown reiterated in their final visit in August 2013. *Id.* at 256.

Ms. Ford ceased using prescription medications for seizures in July 2014 and has not had a seizure since around that time. *See* DJE No. 30. She also now self-medicates for her headaches by using Essential Oils. Ms. Ford has not been treated by a neurologist, or any other physician, for seizures since her last visit with Dr. Brown on August 22, 2013.

At trial, Dr. Jahre testified that the hemorrhage Ms. Ford experienced could cause a "seizure focus." Jerome Block, M.D., an expert in neurology and another of Plaintiffs' experts, viewed the videos taken by Mr. Ford at trial and, when one video of Ms. Ford's facial twitching was played, Dr. Block described the twitching as "rhythmic twitching of several muscle groups of the left side of her face. The upper lip more than the lower lip, a little wiggle of the chin muscle on the left side, the cheek as well, and if you look very carefully, the left eyelid, just a very minor twitch." He also noted that, in the video, her head and neck were turned to the left, which he described as a "classic picture" of a focal seizure because the head and eyes are usually deviated away from the focus of the seizure, here, the right frontal hemorrhage. Because Ms. Ford's eyes were closed, however, he could not tell whether her eyes were focused to the left. Dr. Block recognized that such twitching could possibly be faked or could be the result of psychogenic seizures, but he did not believe any "faking" could be done with that sort of rhythm.

Noting that Dr. Fasano and Dr. Brown had both treated Ms. Ford for epilepsy, Dr. Block testified that epilepsy will rarely "go away" entirely. He stated that neurologists do not "cure" epilepsy; they only treat it. He further indicated that, even if Ms. Ford has not had a seizure in several months or years, she has not necessarily been cured of epilepsy, but rather has only been

---

[11] Pseudoseizures or psychogenic seizures are non-planned abnormal physical or behavioral changes that can be caused by emotional or psychological problems. Unlike an epileptic seizure, pseudoseizures seizures will not show abnormal brain activity on an EEG.

lucky for however many months or years it has been since her last seizure. In other words, because the seizure focus exists, according to Dr. Block, Ms. Ford will always be at risk for another. With respect to what treatment Ms. Ford may need going forward for these twitching spells, Dr. Block testified:

> What she needs and what all of us need is one really good general practitioner or internist to be your guide. You don't have to go running off to specialists for everything, which is a great tendency in the American population. . . . Go see your family doctor and see whether the family doctor can solve it. If you have a competent family doctor, you don't need much else in the way of medical care. . . . [I]f she feels she doesn't need or want to see a neurologist because things are just going well, that's fine, but she has to be in touch with her internist and let that internist help decide what . . . she needs.

Roger Kelley, M.D., a defense expert in neurology, testified that there was a relationship between the events on September 29, 2009 and the twitching, headaches, and cognitive complaints that Ms. Ford reported after the hemorrhage and seizure. Specifically, he explained that cell irritation in the brain could lead to seizure activity. It was Dr. Kelley's opinion, however, that there was no evidence of diffuse cerebral edema on Ms. Ford's brain scans and that, because Ms. Ford had not had a twitching spell in over a year without being on any medication to control seizures, he expected that Ms. Ford would not need to resume treatment for seizure disorder; in other words, assuming she in fact had a seizure predisposition after September 2009, that predisposition had resolved. In support of this opinion, he pointed to the fact that the CT scans taken on January 28, 2010 and February 7, 2014 showed that the hemorrhage that had occurred in September 2009 had completely reabsorbed and that there was no evidence of diffuse cerebral edema on those scans. Dr. Kelley also agreed with Dr. Block that, when an individual has a prior susceptibility for seizures, there is always a risk of reoccurrence, but that any susceptibility could be adequately controlled by, for instance, avoiding certain pain medications and sleep-deprivation. With respect to her headaches and migraines, Dr. Kelley

explained that Ms. Ford might benefit from seeing a headache specialist if the problems were ongoing, but he noted that the four headache-inciting factors that Ms. Ford mentioned—her menstrual cycle, stress, weather, and sleep deprivation—are not uncommon headache-inciting factors among people who had not previously had an eclamptic event. Moreover, he explained that, unless there was some continuing inciting factor in her brain, such as a brain tumor or some other problem creating pressure on the brain, he did not expect the events of September 29, 2009 to lead to a long-term headache problem that could not be managed.

Finally, James Levenson, M.D., a psychiatrist, testified that the fact that Ms. Ford's twitching episodes were not controlled despite varying types and increasing levels of medications and the fact that the episodes stopped when she stopped taking seizure medication made him doubt that Ms. Ford's twitching episodes were epileptic in nature, as opposed to being related to psychological conditions such as depression and anxiety.

### 4. Cognitive Complaints

In addition to the twitching and staring spells, after the incident, Ms. Ford complained of word-finding problems and difficulty concentrating. In a visit at the Malcolm Grow Mental Health Clinic on October 26, 2009, Ms. Ford reported that she could not read or comprehend nearly as well as she could prior to the incident. PE No. 10 at 15010. At Ms. Ford's first visit with Dr. Fasano on October 27, 2009, Dr. Fasano indicated in her assessment and plan: "I believe that the [patient's] depression is causing her cognitive complaints of poor concentration and distractibility." DJE No. 4 at 21. Ms. Ford continued to complain of memory problems in later visits, however, and Dr. Fasano ordered neuropsychological testing to assess her cognitive issues. Although Ms. Ford participated in a neuropsychological intake interview on January 28, 2010, she did not follow up with testing at Bethesda Naval. Dr. Fasano ordered testing again at

31

Walter Reed, but again Ms. Ford did not have the testing done. None of Dr. Brown's visit notes indicate that Ms. Ford reported any cognitive complaints or impairments during her visits between January 11, 2011 and August 22, 2013. *See* DJE No. 4 at 176–79, 188–89, 191–93, 208–210, 223–25, 228–31, 233–35, 256–59.

At trial, Plaintiffs introduced the testimony of Paul Fedio, Ph.D, a neuropsychologist, whose job it is to identify what effect, if any, a brain injury has on an individual's cognition, personality, and their life generally. Dr. Fedio met personally with Ms. Ford before trial and interviewed her and Mr. Ford. He also administered a series of tests to Ms. Ford to determine her cognitive function, including tests to determine her reading abilities, memory, verbal fluency, executive function, and a test of "memory malingering"—a test to determine whether Ms. Ford was feigning any cognitive dysfunction.

Dr. Fedio's opinion was that, prior to her injury, Ms. Ford demonstrated that she was at least average or high-average intelligence. He pointed to the "A" grades Ms. Ford earned in community college and the fact that she had worked as a nurse's aide. He also testified, however, that it can be very difficult to determine what someone's cognitive function was before an injury and that "sometimes you have to flip a coin" to make that determination. Nevertheless, he testified that post-injury, Ms. Ford now had trouble being spontaneously verbal and that she was dysfluent, meaning that her language skills had decreased from what they once were. Dr. Fedio also testified that she has difficulties communicating and with language expression. According to his testing, Ms. Ford was reading at a seventh-grade level which put her in the fifth percentile of her peers, and her reading rate was exceptionally slow at 143 words per minute. She also did very poorly in "working memory," in other words, she struggled to multitask and maintain different pieces of information in her mind at the same time, and Dr. Fedio indicated that her

memory in general had declined. It was his opinion that these problems were newly acquired and that they "can be tied causally to the medical issues in question and can be linked directly to an impaired level of brain functioning." He also testified that, because of these cognitive difficulties, particularly her memory problems, it was his opinion that Ms. Ford did not have the ability to perform the tasks required of an LPN, which was Ms. Ford's desired profession. Finally, Dr. Fedio opined that Ms. Ford would never fully recover to her pre-injury level of cognitive function.

Dr. Block also explained at trial that diffuse cerebral edema can cause cognitive dysfunction and that Dr. Fedio's findings were consistent with the diffuse brain damage that could be seen on the September 30, 2009 MRI. But Dr. Block qualified his opinion by stating that he "lack[ed] any knowledge whatsoever of anything else that might contribute to the problems [Ms. Ford] describe[d]."

Dr. Kelley, on the other hand, testified that, from a neurological standpoint, he expected that any cognitive issues would have resolved within six to twelve months from the initial injury in September 2009. In his review of Ms. Ford's records, he did not see any "major tissue involvement" that would lead to long-term cognitive impairment. Additionally, defense expert Cynthia Munro, Ph.D., a neuropsychologist, also personally met with and interviewed Ms. Ford and administered a series of tests to determine her cognitive function five months after Dr. Fedio completed his testing. According to Dr. Munro's testing, it appeared that Ms. Ford had improved significantly during that time.[12] Dr. Munro explained that, in order to objectively determine any reduction in cognitive capabilities, one must compare the capabilities demonstrated on

_____

[12] Dr. Fedio explained that the improvement could be caused by a phenomenon called "practice effect"—that is, that because Ms. Ford had taken similar tests only five months prior, she was able to improve the second time around. Dr. Munro explained, however, that she administered an alternative version of the same tests and that there is generally no statistical difference in scores when those different versions are administered in a short period of time.

neuropsychological testing after September 29, 2009, with data establishing her baseline capability before September 29, 2009. But Ms. Ford did not have any neuropsychological testing performed until the instant litigation ensued. The only objective data available to establish Ms. Ford's baseline level of cognitive function are her elementary school, high school and community college records and standardized testing completed when she was in sixth grade, which, according to Dr. Munro, demonstrated that Ms. Ford was "perfectly average" in her cognitive abilities. Dr. Munro testified that this objective data indicates that Ms. Ford's cognitive function as determined by the neuropsychological testing is comparable to her baseline. By way of example, Dr. Munro explained that her testing showed that Ms. Ford had an average IQ of 93 and that she performed in the 97th percentile with respect to verbal comprehension.

Additionally, as part of her interview, Dr. Munro asked Ms. Ford what her plans were for the future. Ms. Ford responded that she had wanted to return to school and become a nurse but that every time she thinks she can do so, she realizes she cannot "due to migraines and being exhausted from caring for her children"; Ms. Ford also complained that she felt that she is easily' frustrated and has too many responsibilities.

In any event, the absence of any neuropsychological testing prior to Ms. Ford's injury makes it difficult to discern the level of cognitive impairment Ms. Ford might have suffered as a result of the hemorrhage and seizure.

## III.    CONCLUSIONS OF LAW

The FTCA confers jurisdiction on district courts to hear claims "for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant . . . ." 28 U.S.C. § 1346(b)(1). The

FTCA thus serves as a waiver of the Government's sovereign immunity. *See Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005). In cases arising under the FTCA, the Government is liable "in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674. Because the allegedly negligent acts exposing the Government to liability in this case occurred in Maryland, Maryland law governs Plaintiffs' claims. *See* 28 U.S.C. § 1346(b)(1).

In Maryland, to recover for injuries caused by alleged medical malpractice, a plaintiff must prove, by a preponderance of the evidence, (1) the applicable standard of care; (2) that this standard has been breached; and (3) a causal relationship between the violation and the injury. *See, e.g.*, *Weimer v. Hetrick*, 525 A.2d 643, 651 (Md. 1987); *Lawson v. United States*, 454 F. Supp. 2d 373, 416 (D. Md. 2006). It is well established in Maryland that

> [T]he burden of proof in a malpractice case is on the plaintiff to show a lack of the requisite skill or care on the part of the physician and that such want of skill or care was a direct cause of the injury . . . . General rules of negligence apply to malpractice cases . . . . Therefore, to constitute actionable negligence, there must be not only causal connection between the negligence complained of and the injury suffered . . . but it must be the proximate cause.

*Reed v. Campagnolo*, 630 A.2d 1145, 1148 (Md. 1993) (internal quotation marks and citations omitted).

## A.  Standard of Care

Physicians owe a duty to use the care expected of a reasonably competent practitioner of the same class and acting in the same or similar circumstances. *Upper Chesapeake Health Ctr., Inc. v. Gargiulo*, 223 Md. App. 772, *cert. denied sub nom.*, *Upper Chesapeake Med. Ctr. v. Gargiulo*, 123 A.3d 1007 (Md. 2015) (quoting *Dingle v. Belin*, 749 A.2d 157, 162 (Md. 2000)). Under this standard, the trier of fact must take into account "advances in the profession, availability of facilities, specialization or general practice, proximity of specialists and special

facilities, together with all other relevant considerations . . . ." *Shilkret v. Annapolis Emergency Hosp. Ass'n*, 349 A.2d 245, 253 (Md. 1975). "[T]he defendant's use of suitable professional skill is generally a topic calling for expert testimony . . . ." *Johns Hopkins Hospital v. Genda*, 258 A.2d 595, 599 (Md. 1969).

Plaintiffs argue that Dr. Harper breached the standard of care when she failed to diagnose Ms. Ford with preeclampsia on September 28, 2009, and, more specifically, that she breached the standard of care by not at least conducting her own test for proteinuria, rather than relying on the negative dipstick result from Calvert Hospital the day before. The Court agrees. Although at least one piece of medical literature, the Williams Obstetrics textbook, indicates that preeclampsia may be diagnosed by a 1+ reading on a urine dipstick, that same textbook states: "The degree of proteinuria may fluctuate wildly over any 24 hour period even in severe cases. Therefore a single random sample may fail to demonstrate even significant proteinuria." Thus, even if it was within the standard of care for Dr. Christianson to rely on a single dipstick in the hospital setting, as the jury in fact found after trial, the one urine dipstick test ordered by Dr. Christianson at Calvert Hospital was not sufficient to rule out whether Ms. Ford had preeclampsia the following day on September 28, 2009.

Indeed, it is clear from the medical literature and the expert testimony that the urine dipstick test ordered by Dr. Christianson only ruled out that Ms. Ford did not have elevated protein in her urine *at that time*. Thus, although it was not improper for Dr. Christianson to rely on the negative urine dipstick and conclude that it was proper to discharge Ms. Ford without further testing, because "[t]he degree of proteinuria may fluctuate wildly over any 24 hour period even in severe cases," the same cannot be said of Dr. Harper. This is particularly apparent when one considers the different roles an emergency room doctor and an obstetrician serve in

36

treatment: Dr. Christian, as an emergency room doctor, was concerned with treating any *emergency*—something that could not wait for follow-up by another physician. Dr. Harper, however, a doctor in the OB Clinic, had greater opportunity for diagnosing what was causing Ms. Ford's elevated blood pressure.

The Court recognizes, as it must, that doctors often are incapable of identifying the singular cause of a particular symptom. But in this instance, Ms. Ford should not have been discharged with severe hypertension without a more thorough analysis to eliminate the possibility that preeclampsia was the cause of that hypertension. Although the record indicates that Dr. Harper did indeed consider the possibility that Ms. Ford had preeclampsia, she did not order a 24-hour urine test or even another urine dipstick test. Ms. Ford may not have had protein in her urine the night before at Calvert Hospital, but, because the protein levels can vary widely over a 24-hour period, the Court believes that it is more likely than not that, had Dr. Harper sought to independently ascertain the level of protein in Ms. Ford's urine on September 28, 2009, she would have discovered that Ms. Ford suffered from preeclampsia.

In any event, even if the Court did not conclude that it was a breach of the standard of care to not conduct another test for proteinuria on September 28, 2009, the Court would still find that it was a breach of the standard of care to release Ms. Ford with severely elevated blood pressure in the absence of evidence that Dr. Harper adequately treated her hypertension. Notably, Dr. Caughey testified that, aside from the issue of whether Ms. Ford had elevated protein in her urine on September 28, 2009, his main concern would be her severely elevated blood pressure. In order to satisfy the standard of care, Dr. Harper was required, according to Dr. Caughey and as the Court now finds, to lower her blood pressure as quickly as possible so as to avoid the possibility of Ms. Ford suffering a cerebral hemorrhage.

Ms. Ford's only recorded blood pressure from the Malcolm Grow clinic on September 28, 2009 was 181/90, which is severely elevated. Although Dr. Harper testified that more blood pressure measurements "would have" been taken because that was the clinic's standard operating procedure, the Government cannot establish that more measurements were in fact taken and, if so, what they were. The Government, in essence, asks the Court to take a circular route to its desired destination: to find that the Government doctors did not negligently discharge Ms. Ford with severely elevated blood pressures—by assuming they would not have negligently failed to take additional blood pressures—and further assuming that those blood pressure readings were low enough that discharging Ms. Ford was not negligent. In order words, the Government asks the Court to conclude that its doctors did not commit malpractice because their standard procedure would be to not commit malpractice. The Court will not do that. To the extent the Court is left to guess what Ms. Ford's blood pressure was at the time she was discharged from the Malcolm Grow OB Clinic, such a gap in evidence is due entirely to the Government's failure to record it.

Thus, given the consistently elevated blood pressures that Ms. Ford experienced over a 24-hour period, the lack of evidence that those pressures had been reduced or adequately addressed, and the events that occurred the following day, the Court concludes that it is more likely than not that Dr. Harper breached the applicable standard of care on September 28, 2009.

### B. Causation

Having determined that the standard of care was breached on September 28, 2009, the Court now must determine whether that breach caused Ms. Ford's injuries. Departure from the standard of care does not, in and of itself, warrant a finding of medical malpractice; it is the plaintiff's burden to show that such want of skill or care directly caused the injury. *See, e.g.,*

*Lane v. Calvert*, 138 A.2d 902, 905 (Md. 1960); *Mackey v. Dorsey*, 655 A.2d 1333, 1343 (Md. Ct. Spec. App. 1995). In demonstrating proximate causation, "the plaintiff must prove the defendant's breach of duty was more likely than not (*i.e.*, probably) the cause of the injury." *Hurley v. United States*, 923 F.2d 1091, 1094 (4th Cir.1991). This cannot be established based solely on speculation or conjecture. *See Baulsir v. Sugar*, 293 A.2d 253, 255 (Md. 1972) (noting that a "plaintiff has not met [her] burden if [s]he presents merely a scintilla of evidence where the [finder of fact] must resort to surmise and conjecture to declare [her] right to recover.").

Plaintiffs' theory of causation is as follows: as a result of Dr. Harper's failure to adequately treat Ms. Ford's high blood pressure and her failure to diagnose and treat Ms. Ford for preeclampsia, Ms. Ford ultimately suffered from an intracerebral hemorrhage and an eclamptic grand mal seizure. The severe hypertension / eclampsia, in turn, caused the findings of PRES and restricted diffusion on Ms. Ford's MRI. The hemorrhage created a nidus for future seizure activity, and the restricted diffusion caused certain cognitive defects.

Ms. Ford's medical records are, indeed, replete with references to a "hypertensive intracerebral hemorrhage," and, specifically, that Ms. Ford had a "history of right frontal hemorrhage and seizure [due to] hypertension (eclampsia post-partum)." *See, e.g.*, PE No. 50 at 11084; *see also id.* at 11045, 11086, 11105, 11574. And, in further support of Plaintiffs' theory of causation, they offered the testimony of several experts. First, Dr. Caughey, who, in addition to testifying as a standard of care expert, was also qualified as an expert with respect to the issue of causation, testified that if Ms. Ford's blood pressure was adequately controlled, she would not have had a brain bleed or seizure. He stated that the hemorrhage was caused by hypertension, regardless of whether or not that hypertension was caused by preeclampsia. Dr. Jahre also explained that, with respect to her finding of PRES on the MRI scans taken on September 30,

2009, she was aware of no other causes in Ms. Ford's medical records other than preeclampsia and eclampsia. Finally, Dr. Block testified that, in reviewing Ms. Ford's CT scans and MRI, he found that she "demonstrated evidence of significant hypertension, evidence of edema throughout the brain and a small brain hemorrhage, which rapidly led to a grand mal tonic-clonic seizure . . . ." Dr. Block and Dr. Fedio, Plaintiffs' experts in neurology and neuropsychology, respectively, each testified that, in their opinion, these injuries would have long-lasting effects and were not expected to be "cured." As previously mentioned, Dr. Block opined that Ms. Ford's seizure tendency would never relent, and Dr. Fedio testified that he expected that Ms. Ford would never fully recover her pre-injury level of cognitive function.

But defense experts contended that, even assuming Ms. Ford suffered from a seizure tendency after September 29, 2009 or suffered some cognitive defects in the immediate aftermath of her injury, they would not expect Ms. Ford to suffer any long-term disabilities as a result of the hemorrhage—which was reabsorbed as of January 28, 2010—or the grand mal seizure she experienced while in the hospital.

Additionally, two defense experts testified to provide an alternative theory of causation to undermine Plaintiffs' case. Dr. Monsein, a neuroradiologist, and Baha Sibai, M.D., an expert in maternal fetal medicine and pregnancy-related conditions, specifically preeclampsia, eclampsia, and cerebral angiopathy, both testified that hypertension-induced cerebral bleeds or hemorrhages are *typically* found in the basal ganglia region of the brain.[13] That region of the brain has highly sensitive end vessels that are particularly sensitive to hypertension, but the same sensitive end vessels are not found in the frontal lobe of the brain. Ms. Ford's hemorrhage was not located in the basil ganglia region of the brain, but rather was in the frontal lobe, an area of the brain that is not typically associated with hypertension. Dr. Monsein agreed with Plaintiffs' expert, Dr. Jahre,

---

[13] Plaintiffs' expert, Dr. Jahre, agreed with this point on cross-examination.

that the September 30, 2015 MRI showed PRES, but Dr. Sibai explained that there are several possible conditions associated with a finding of PRES in a postpartum patient, including preeclampsia or eclampsia, cerebral angiopathy, hypertensive encephalopathy, cerebral venous thrombosis, and the use of immunosuppressive medications.

Through process of elimination, Dr. Sibai testified that, in his opinion, Ms. Ford's injuries were the result of cerebral angiopathy, rather than undiagnosed preeclampsia or eclampsia. Dr. Sibai explained that Ms. Ford never met the diagnostic criteria for preeclampsia, but that he also felt that her symptoms more closely correlated with cerebral angiopathy. In particular, Ms. Ford's concerns began with a sudden onset headache, what Dr. Sibai characterized as a "thunderclap headache," which occurred five days postpartum. This was, according to Dr. Sibai, the classic presentation and timing for cerebral angiopathy. Postpartum preeclampsia, on the other hand, typically occurs in the first 48 hours after birth, according to Dr. Sibai. The later onset headache, he testified, supported his conclusion that cerebral angiopathy is the more likely cause. Dr. Sibai found further support in his conclusion from the fact that Ms. Ford took certain prescription medications during the pre- and post-natal period that are associated with cerebral angiopathy, namely, Zoloft and Motrin, which can cause vasoconstriction, or a spasm of the arteries in the brain. *See, e.g.*, DJE 2 at 93, 99, 174, 196; DJE 3 at 6, 32, 86. Additionally, Dr. Sibai testified that the body changes that Ms. Ford was experiencing in the postpartum period, specifically, the reabsorption of the volume of fluid that once occupied the placenta, would have a vasoactive effect. On cross-examination, however, Dr. Sibai agreed that, to make a diagnosis of cerebral angiopathy, one would have to find a "string of beads" appearance on the cerebral arteries, which can only be shown on an angiogram. Ms. Ford, however, never had an angiogram.

41

Finally, because cerebral angiopathy can occur in hypertensive and non-hypertensive patients, Dr. Sibai explained that there is no evidence that treatment of hypertension would prevent cerebral angiopathy, and thus, it was his opinion that treating Ms. Ford's elevated blood pressure with intravenous medication, or higher dosage oral medication while monitoring blood pressure during a prolonged stay at Malcolm Grow Clinic on September 28, 2009 would not have prevented the hemorrhage and seizure. The Government's theory of causation, therefore, is that Ms. Ford's hemorrhage and seizure were more likely than not caused by cerebral angiopathy, which caused vasoconstriction, which then caused the hemorrhage and seizure. In other words, the hemorrhage was more likely than not the result of vasoconstriction that occurred independent of hypertension.

As the foregoing discussion shows, the task of determining the issue of causation in this case is far from an easy one. It is worth noting again that the Court is operating under a preponderance of the evidence standard. Upon careful consideration of this conflicting evidence, the Court concludes that it is more likely that not that the failure to diagnose preeclampsia and the failure to adequately control Ms. Ford's blood pressure on September 28 caused a hypertensive bleed and an eclamptic seizure.

In short, all doctors diagnosing Ms. Ford in real-time concluded that she suffered an eclamptic seizure on September 29, 2009 and that she had a brain hemorrhage caused by hypertension. Many of the experts who testified at trial agreed with that diagnosis. Although Drs. Sibai and Monsein raise reasonable doubts as to these opinions, their testimony did not tip the scale far enough under a preponderance of the evidence standard to cause the Court to conclude that some other illness, missed by all of the doctors diagnosing Ms. Ford at the time and unrelated to the breach of the standard of care by Dr. Harper, caused her injury. Notably, while

Dr. Sibai is of the opinion that cerebral angiopathy caused the hemorrhage, he acknowledged that he cannot diagnose cerebral angiopathy without observation of a "string of beads" on an angiogram, which did not occur here. And, although Dr. Monsein agrees with Dr. Sibai that a hypertensive bleed "usually" appears in a different section of the brain, *i.e.*, the basal ganglia, no witness at trial testified that a hypertensive bleed could never occur in the frontal lobe where Ms. Ford's hemorrhage occurred, or that it was so unlikely to occur there that Plaintiffs' theory of causation had to fail under a preponderance of the evidence standard.

The fatal limitation in Dr. Sibai's testimony is that he reaches his conclusion through a process of elimination rather than by diagnosis. In other words, he cannot say that Ms. Ford in fact had cerebral angiopathy; he can only say that it is the one syndrome on the list that he cannot exclude. Indeed, there is an inherent contradiction in Dr. Sibai's testimony. He says that Ms. Ford's case is difficult to diagnose, yet he lands on a "diagnosis" by dismissing the idea that this could be an unusual demonstration of hypertension or preeclampsia and lands on cerebral angiopathy without performing the test that is necessary to confirm it.

Ultimately, to rule for the Government on the issue of causation would require the Court to say that, despite having severe hypertension that was not adequately treated and more likely than not having preeclampsia that went undiagnosed, Ms. Ford coincidentally had another unrelated condition that caused her to have a brain bleed and that such condition was missed by all of the doctors evaluating her at the time. The Court, of course, cannot definitively refute that possibility. But it need not do so in order to rule for the Plaintiffs. Thus, the Court concludes that it is more likely than not that Ms. Ford's untreated hypertension and undiagnosed preeclampsia caused the injuries she sustained on September 29, 2009.

43

Nonetheless, as will be further explained below in the discussion of damages, the Court finds that it is more likely that not that, although Ms. Ford may have suffered certain short-term effects from the hemorrhage and seizure—including the twitching episodes and some cognitive dysfunction—any such injuries have since resolved, and the longstanding impact of the events of September 29, 2009 is mild, if there is any impact at all. Indeed, no injury from which she presently suffers cannot be said to find its roots, if not its trunk and limbs, in a condition that preexisted the medical malpractice that occurred in this case.

In summary, the Court concludes that Dr. Harper's breach of the standard of care caused Ms. Ford injury—a brain hemorrhage and seizure—and that those injuries may have included some cognitive difficulty and twitching in the immediate aftermath of the hemorrhage and seizure. But the Court further concludes that it is more likely than not that those injuries have overwhelmingly resolved, such that Ms. Ford faces little, if any, increased difficulties or lingering injury connected to Dr. Harper's breach of the standard of care.

## C.  Damages

Maryland law again controls the Court's determination as to the nature and measure of damages to be awarded. *See, e.g.*, *Lawson*, 454 F. Supp. 2d at 417 (citing *Richards v. United States*, 369 U.S. 1, 6, 13–14, 82 S.Ct. 585 (1962)); *Burke v. United States*, 605 F. Supp. 981, 987–88 (D. Md. 1985) (citing *United States v. Muniz*, 374 U.S. 150, 153, 83 S.Ct. 1850 (1963); 28 U.S.C. § 1346(b) and § 2674). "Maryland law entitles a plaintiff to recover the reasonable value of all damages caused by a defendant's wrongful conduct." *Lawson*, 454 F. Supp. 2d at 417. The law in Maryland is clear that a tortfeasor is responsible for any aggravation of a preexisting condition, even where that condition constitutes an injury or disability. *See, e.g.*,

*Harris v. Jones*, 380 A.2d 611, 616 n.2 (Md. 1977); *Feeney v. Dolan*, 371 A.2d 679, 688 (Md. Ct. Spec. App. 1977).

### 1. Past and Future Care Needs

The Court first considers what medical and other care expenses Ms. Ford is entitled to recover as a result of her injuries. "Maryland law entitles a plaintiff to recover the reasonable value of all damages caused by a defendant's wrongful conduct, including damages for past medical care, and damages for future medical care." *Lawson*, 454 F. Supp. 2d at 417 (citing *Mt. Royal Cab Co. v. Dolan*, 171 A. 854, 854 (Md. 1934); *Walston v. Dobbins*, 271 A.2d 367, 371 (Md. Ct. Spec. App. 1970)). Damages for medical and other future expenses are recoverable under Maryland law if it is more likely than not that the expense will be incurred. *See id.* (citing *Burke*, 605 F.Supp. at 988). Where a plaintiff seeks to recover lost future benefits, "it is the plaintiff's burden to prove damages with a reasonable amount of certainty." *Lewin Realty III, Inc. v. Brooks*, 771 A.2d 446, 476 (Md. Ct. Spec. App. 2001), *aff'd*, 835 A.2d 616 (Md. 2003), *abrogated on other grounds by Ruffin Hotel Corp. of Maryland v. Gasper*, 17 A.3d 676 (Md. 2011).

Although the Court ruled before trial that Plaintiffs were not permitted to introduce evidence of certain costs that were *predicted* to have been needed but were not actually incurred—such as medical care, child care, or other related costs which an expert projected would be incurred between the time of injury and trial—the Court also ruled that the Fords may be entitled to recover damages by introducing evidence of the money they actually expended to cope with Ms. Ford's injuries from September 29, 2009 up through the time of trial. *See* ECF No. 185 at 3. For reasons unknown to the Court, however, no evidence was introduced to establish any past expenses the Fords actually incurred as a result of Ms. Ford's injury. The only

evidence with respect to this category of damages sought to establish the costs of Ms. Ford's future care needs. Specifically, Estelle Davis, Ph.D, CRC, a rehabilitation counselor, testified that, due to Ms. Ford's ongoing cognitive dysfunction and seizure tendency, she required certain care services to be able to adequately cope with the limitations caused by her injuries. Those care services included, *inter alia*, in-home childcare, cleaning services, individual therapy, and speech therapy. Dr. Davis also testified with respect to the amount of compensation Ms. Ford requires to cover the cost of medication for seizures, headaches, and depression for the rest of her life.

The Court concludes, however, that these damages are not necessary to compensate Ms. Ford in the future. Although Ms. Ford may have had difficulty caring for her children, cleaning the house, and otherwise adjusting to normalcy in the immediate aftermath of her injury, Plaintiffs did not satisfy their burden of proving that such difficulties persist to the present. Indeed, Mr. Hysmith, Ms. Ford's new husband, testified that she keeps a very clean home, she does a good job caring for the children and for himself, that she drives herself and the children as necessary, and that, in all, they have a wonderful relationship. That Ms. Ford also cared for the children on her own in the brief period of time between her separation from Mr. Ford and her courtship with Mr. Hysmith also undermines her claim that she, even as of 2012, let alone today, continues to suffer such debilitating effects from this injury so as to make her incapable of keeping up with household chores and caring for her children.

Additionally, medications to treat seizures are no longer necessary given that Ms. Ford has not had a seizure in well over one year without seizure medication. Indeed, Plaintiffs' own expert, Dr. Block, testified that under these circumstances, all Ms. Ford needs is "one really good general practitioner or internist," undermining Dr. Davis's testimony that neurology follow-up was required for the rest of Ms. Ford's life. The Court is persuaded that even assuming Ms. Ford

suffered from seizure phenomenon after September 29, 2009, any such seizure predisposition has resolved. But even if that were not the case, the Court would not be inclined to award Ms. Ford damages for seizure medicine. Because Ms. Ford can only recover such damages if it is more likely than not that the expense will be incurred, *see Lawson*, 454 F. Supp. 2d at 417, if she will not be taking any seizure medication because she would rather pursue holistic remedies, there is no need for the Court to compensate for that expense. And, even assuming compensation for such holistic remedies such as Essential Oils would otherwise be permissible under the law, no evidence was introduced at trial to prove the ongoing costs of Essential Oils.

So, too, with respect to Ms. Ford's ongoing headaches and migraines. To the extent that Ms. Ford will rely only on Essential Oils or other holistic remedies to treat her headaches, she has not proven that the cost of headache medicine is that which she is likely to incur in the future. And, in any event, she has not proven that it is more likely than not that her ongoing headaches are the result of her injury. Although it seems that she continues to suffer from headaches today, an issue that she did not suffer prior to her injury, the evidence adduced at trial frequently indicated that her headaches were triggered by menses, weather, stress, and lack of sleep—triggering factors that are common amongst people who have not suffered an eclamptic seizure. Additionally, even if court was inclined to allow Ms. Ford to recover the cost of headache medicine going into the future, there is insufficient evidence in the record to allow the court to do so; no testimony established the cost of any headache medicine, let alone what it would cost over her lifetime, reduced to present value. *Lewin Realty III*, 771 A.2d at 466 ("Future damages must be established with reasonable certainty, and must not rest upon speculation or conjecture.").

Finally, from the Court's observation of Ms. Ford's testimony over a two-day period during trial, the Court cannot deny that Ms. Ford suffers from some amount of anxiety, and it does not dispute that she also is battling depression. But it also cannot be denied that Ms. Ford's medical records are rife with references to a history of depression and anxiety that predated the events at issue in this case, going back to her high school years. Even if the Court could say that her depression and anxiety is, by some quantifiable measure, greater now than it was before the injury, the Court cannot say that this was more likely than not caused by her injury, rather than a problem with which she has always coped but for which she is now no longer taking medication. Thus, the Court concludes that an award of future care needs is not appropriate in this case.

### 2. Loss of Earning Capacity

In Maryland, a plaintiff may recover damages for loss of earning capacity that may reasonably be expected in the future. *Adams v. Benson*, 117 A.2d 881, 885 (Md. 1955). "The amount recoverable is the difference between the amount of money which the plaintiff was capable of earning before the injury and the amount which he or she is capable of earning thereafter." *Burke*, 605 F. Supp. at 998 (emphasis omitted) (internal quotation marks and citation omitted). "As with the calculation of future medical care, an item is recoverable if it more likely than not would have occurred." *Lawson*, 454 F. Supp. 2d at 424 (citing *Burke*, 605 F. Supp. at 988; *Pierce*, 464 A.2d at 1026).

It was undisputed that Ms. Ford's intention, had she not been injured, was to become an LPN. Plaintiffs argue that, because of her injury, Ms. Ford has suffered from a severe cognitive decline such that she is now incapable of completing the necessary education or to complete the day-to-day tasks required to practice as a nurse. In support of this argument, Plaintiffs principally rely on the testimony of Dr. Fedio and the results of his neuropsychological testing, as well as

Dr. Block's testimony that the MRI finding of diffuse cerebral edema is consistent with findings of cognitive dysfunction. The problem with the neuropsychological evidence, however, is the absence of any neuropsychological testing prior to Ms. Ford's injury that could serve as a comparative baseline to her capabilities post-injury. And, although Ms. Ford had earned high marks in some courses in high school and community college before her injury, she also earned many Cs, Ds, and failing grades throughout her academic career. Dr. Fedio's findings, therefore, may have only been a reflection of the fact that Ms. Ford, like everyone else, has certain strengths and weaknesses in different areas.

That, coupled with the fact that there is a possibility that there was *not*, in fact, any diffuse edema on the MRI scans, and rather, that the dark areas found on the DWI imagery were the result of T2 shine through, as explained by Dr. Monsein, raises enough doubt that the Court is unable to conclude that it is more likely than not that Ms. Ford has suffered any long-term cognitive defects that would prevent her from attaining the same level of professional achievement of which she was capable prior to her injury.[14]

### 3. Noneconomic Damages

#### a.  Ms. Ford's Pain and Suffering

Ms. Ford's physical pain and suffering may be considered as an element of damages. *Greenstein v. Meister*, 368 A.2d 451, 461 (Md. 1977). Similarly, the mental and emotional suffering and anxiety experienced as a result of the injuries and their future consequences is also compensable, *White v. Parks*, 140 A. 70, 72–73 (Md. 1928), as is the loss of Mrs. Ford's

---

[14] Additionally, even if Ms. Ford suffered certain cognitive dysfunction in the immediate aftermath of her injury, Dr. Kelley testified that, from a neurological standpoint, he expected any such issues to resolve within six to twelve months of her initial injury, a time during which Ms. Ford admittedly had no intentions of returning to the work-force.

capacity to enjoy the usual and familiar tasks of life. *McAlister v. Carl*, 197 A.2d 140, 146 (Md. 1964).

Here, the Court has no doubt that Ms. Ford suffered physically, mentally, and emotionally in the immediate aftermath of her injury. Indeed, the pain and suffering experienced during the grand mal seizure she had to endure on September 29, 2009 would alone be reason to provide compensation. Additionally, Ms. Ford struggled to obtain normalcy in the immediate aftermath of her injury, suffering from headaches, twitching, and lethargy, as well as the emotional strain of being unable to care for her newborn daughter. Upon consideration of the foregoing factors, but also considering that her injuries were relatively short-lived, the Court concludes that an award of $500,000 would adequately compensate Ms. Ford for the pain and suffering she had to endure as a result of the medical malpractice that caused her injury.

### b.  Loss of Consortium

Finally, the damage to Plaintiffs' marital relationship as a result of Ms. Ford's injuries is compensable in Maryland. Loss of consortium is a remedy for an injury to the marital entity arising from "the loss of society, affection, assistance, and conjugal fellowship suffered by the marital unit as a result of the physical injury to one spouse through the tortious conduct of a third party." *Oaks v. Conners*, 660 A.2d 423, 428 (Md. 1994); *see also Deems v. Western Maryland Ry.*, 231 A.2d 514, 521 (Md. 1967). When either spouse claims loss of consortium due to injuries sustained by the other, "that claim can only be asserted in a joint action for injury to the marital relationship . . . [and] is to be tried at the same time as the individual action of the physically injured spouse." *Deems*, 231 A.2d at 525. Damages awarded from an action for loss of consortium are defined as "noneconomic damages" and, because a loss of consortium claim is "derivative of the injured spouse's claim for personal injury . . . a single cap for noneconomic

damages applies to the whole action." *Oaks*, 660 A.2d at 430; *see also* Md. Code Ann., Cts. & Jud. Proc. § 11-108.

Having already discussed in detail the Court's conclusions regarding the extent of Ms. Ford's injuries, the Court will not belabor the point here. Suffice it to say that it is clear that Ms. Ford suffered injuries in the immediate aftermath of the hemorrhage and seizure, which made it difficult, at that time, to complete typical household chores, to care for the children, including newborn SF, and to be intimate with Mr. Ford. Even though these injuries improved, the strain on the Fords' relationship was significant, particularly because, as Ms. Ford improved, Mr. Ford seemed to still want to fill in the role as her caretaker. Ms. Ford's desire to obtain more independence ultimately led to the end of their marriage. Ms. Ford's injuries, therefore, clearly damaged the Fords' marital relationship, and the Court concludes that an award of $100,000 is sufficient to compensate them for that damage.

## IV.    CONCLUSION

In accordance with the foregoing findings of fact and conclusions of law, the Court will enter judgment for the Plaintiffs and against the Government in the amount of $600,000. Additionally, the Court will enter judgment in favor of the Private Defendants in accordance with the jury's verdict. The Motion for Judgment as a Matter of Law made by the Private Defendants prior to the end of trial, ECF No. 212, is denied for the reasons stated on the record on December 14, 2015, and Plaintiff's Motion to Strike Defendant's Proposed Findings of Fact and Conclusion of Law, ECF No. 237, is denied. A separate Order follows.

Dated: March 4th, 2016

GEORGE J. HAZEL
United States District Judge

51